A. R. MOSLER & CO. v. LURIE.

(Circuit Court of Appeals, Second Circuit. November 11, 1913.)

No. 31.

1. PATENTS (§ 66*)—ANTICIPATION—DRAWINGS IN PRIOR PATENT.
    A patent for a mechanical combination is not anticipated by a drawing in a prior patent which incidentally shows a similar arrangement, which is not essential to the first invention, and was not designed, adapted, or used to perform the function which it performs in the second invention, and where the first patent contains no suggestion of the way in which the result sought is accomplished by the second inventor.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 79, 81; Dec. Dig. § 66.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—IGNITER FOR GAS, OIL, OR VAPOR ENGINES.
    The Canfield patent, No. 612,701, for an igniter or sparker for gas,. oil, or vapor engines, held not anticipated, valid, and infringed.

3. PATENTS (§ 289*) — SUITS FOR INFRINGEMENT — RIGHT TO ACCOUNTING — LACHES.
    Delay by the successive owners of a patent after the death of the patentee, none of whom were engaged in the business to which it related or made any use of it, in bringing suit for its infringement, of which they had no knowledge, while not constituting such laches as to defeat such a suit, held to bar the complainant from the right to an accounting, where infringements were extensive and had continued for several years.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 467–469; Dec. Dig. § 289.*
    Accounting by infringer for profits, see notes to Brickill v. Mayor, etc., of City of New York, 50 C. C. A. 8; Clark v. Johnson, 120 C. C. A. 389.]

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal from a decree of the District Court, Southern District of New York, which dismissed bill of complaint, in an equity suit brought for infringement of patent. The patent is No. 612,701, issued October 18, 1898 (on application dated August 5, 1897), to Frank W. Canfield for an "igniter or sparker for gas, oil, or vapor engines." The opinion of the District Court will be found in 200 Fed. 433.

William A. Redding and William B. Greeley, both of New. York City, for appellant.

Emerson R. Newell, of New York City (Fred E. Tasker, of New York City, of counsel), for appellee.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge. The patentee in his specifications states that the object of his invention is to produce a method of insulating the electrodes of gas, oil, or vapor engines that will not foul injuriously, so that it will remain in working order, causing the igniting

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

spark to jump across the space between the points of the electrodes. He states that:

"It is a well-known fact that up to this time the fouling of the insulation of the electrodes * * * has been the greatest objection to the successful use of an electric current * * * to pass between the points of stationary electrodes placed in the cylinders or firing-chambers of [such] engines, said points not being in actual contact with each other."

This refers to the "jump-spark" system, not to the "make and break" system, of electric ignition.

"It is an established fact that when the insulation of the electrodes * * * gets foul the intense current will not pass between the points of the electrodes and make the required firing-spark, but follows the fouling of the insulation without making a spark of sufficient intensity to explode the charge * * * of combustible * * *; but when the insulations are not fouled and in good working order the electric current will jump across between the points of the electrodes, and thereby cause an electric spark of sufficient intensity to fire or explode the charge," etc.

The specification states that patentee's improvement consists—

"of a counterbore or recess around the electrode at a point where it enters the cylinder of a gas, oil, or vapor engine of such size and depth as will prevent the explosive mixture from cylinder or firing-chamber circulating into said cavity far enough to deposit the products of its combustion onto the insulator at the deepest part of the counterbore or recess. I find by actual test that a counterbore or recess for a quarter-inch electrode works satisfactorily by being half-inch diameter by one and one-quarter inches deep; but a counterbore or recess half-inch diameter by three inches deep is still more satisfactory, for the reason that it more completely prevents circulation. A counterbore or recess of larger diameter than its depth will not prevent circulation and consequent fouling."

The combination of the patent is shown in Figure 1.

In this the electrodes are shown entering the firing-chamber, 6 showing the space where the electric current should form firing-spark; 7 shows the insulator and 8 the deep, small-diameter counterbore or recess. The specification closes with the statement:

"It is immaterial what shape or form the counterbore or recess is made in, so that it surrounds the electrode and of such size and depth that it prevents the circulation of the explosive mixture into the deepest part of the same."

The claims are:

"1. In a gas, oil, or vapor engine igniter or sparker, a recess or counterbore around

the electrode or electrodes and above its or their sparking points when said electrodes are used vertically, for the purpose of preventing an injurious accumulation of the products of combustion or other foul matter on the insulation of said electrodes, substantially as and for the purpose set forth.

"2. In a gas, oil, or vapor engine igniter or sparker, a recess or counterbore of such size and depth as to prevent the explosive mixture used in the cylinder from circulating into said counterbore or recess far enough to come in contact with its deepest part around the electrode or electrodes at or near the point where said electrode or electrodes leave the insulator to enter the cylinder or firing-chamber, for the purpose of preventing an injurious accumulation of the products of combustion or other foul matter on the insulation of said electrode, substantially as and for the purpose set forth."

That air at the bottom of a deep narrow recess would be "trapped," so that there would be no circulation at the bottom when there was disturbance in the space into which the recess opened, was a fact in physics well known long before there were any gas engines. That circumstance, however, would not defeat this patent, since Canfield, so far as this record discloses, was the first to point out that, when a sparking-device of this type was so constructed as to secure the presence of such a recess between the two electrodes, the fouling of insulation and the establishment thereby of a path for the electric current other than the one in the course of which there was a spark-jump would be avoided.

None of the various patents and publications introduced in evidence as showing the prior art have anything to say about the desirability of having such a recess between the electrodes. It is contended, however, that some of them show such a recess narrow and deep—that such recess would necessarily act as the patentee's does, because every such recess under the law of physics above referred to would trap the air at its bottom; and since the recess was there in the prior art, it makes no difference that the prior inventor who placed it there did not appreciate or announce the useful function it performed.

Reliance is had on a former decision of this court. Consolidated Bunging Co. v. Metropolitan Brewing Company, 60 Fed. 93, 8 C. C. A. 485. In that case the claim of the patent (for an automatic pressure relief) covered "a mechanical fit valve, in combination with a surrounding chamber, for containing water to prevent fouling." A prior patent disclosed a mechanical fit valve with a chamber above and surrounding the valve seat. Although the prior patentee said nothing about putting water in this chamber to prevent fouling or for any purpose, it was manifestly capable of holding water, and, being the identical mechanical combination of the patent sued on, it was an anticipation. But in the Bunging Case the presence of the chamber surrounding the valve was clearly pointed out in the specifications of the earlier patent; "the shell containing the valve which rests on the arm" clearly indicated a chamber with mechanical fit valve. Its presence was not inferred from an inspection of the drawings of the earlier patent.

[1] With a deliverance of the Circuit Court of Appeals for the Seventh Circuit (Gray Telephone P. S. Co. v. Baird Mfg. Co., 174 Fed. 417, 98 C. C. A. 353) we fully concur. It reads as follows:

"A patent for a mechanical combination is not anticipated by a drawing in a prior patent which incidentally shows a similar arrangement which is not essential to the first invention, and was not designed, adapted, or used to perform the function which it performs in the second invention, and where the first patent contains no suggestion of the way in which the result sought is accomplished by the second inventor."

[2] The prior publication especially relied upon is known as "Die Gas-Maschine." All that there is in it which is at all relevant is the following figure and description:

"The positive wire of the induction apparatus is attached at m to a brass button n seated on a porcelain cylinder o: this is set firmly into the cover p, which closes the hole leading to the cylinder. It is perforated and contains the wire q drawn out to a point. Opposite this stands the point of a second wire r, which is screwed into the brass case s, which, on its part, is seated in the cover p. The negative wire of the igniter is led onto the cylinder. If, now, a current circulates, the sparks will leap from q to r."

There is nothing in this description which calls for any recess at all. Referring to the drawing, we perceive that if the brass case s be an imperforate hollow cylinder there will be a recess between its interior and the porcelain cylinder o. But unless the brass case s be imperforate the recess will not trap air; and there is nothing to show that it is to be imperforate. Its only function is to seat the "second wire" which is screwed into it and it could perform that function perfectly if it were a framework casing. Moreover, assuming that the case were imperforate: From its outlet into the cylinder to the bottom of the recess the depth would about equal the diameter, which would not be the recess of the patent. If only that part of the recess which lies to the left of the head of the porcelain be considered, the drawing would indicate a recess considerably deeper than its width, but there is nothing anywhere to show that the proportions of the drawing are to be strictly adhered to. The brass which surrounds and supports the porcelain might be continued further to the right, or the brass case s might be of larger interior diameter, with the result that there would no longer be a recess of the sort described in the Canfield patent. There is nothing to show that the *proportions* of the drawing are other than accidental; the draughtsman would have correctly depicted "Die Gas-Maschine" of the prior art if he had proportioned the parts differently, showing a recess whose depth was no greater than its width.

The next reference to the prior art is a patent to Sainsevain (U. S., No. 461,802). Its Figure 4 and a brief excerpt from the specifications indicate the device:

"52 52a is a pair of posts, the lower ends of which project into the exploding-chamber 53 and carry platinum points 54 54a to produce the spark. The insulator-disk 55 fits snugly in the tube 50 and it securely holds the posts 52, 52a within its opening 56. The insulator 55 is confined by means of an upper plate or disk 57 within the tube 50, and a lower plate or disk 58, that rests upon an interior ledge or shoulder 59, turned in the tube. The upper plate 57 is secured by means of screws 60, tapped through the tube or shell and into the same. The upper plate 57 and the lower plate 58 are provided with openings 61 62 respectively, which are large enough to leave spaces around the posts 52 52a, thus preventing the contact of the latter. Line-wires lead from the electrical apparatus now to be described and are connected to the posts 52 52a."

Here there are recesses 62 with insulation at the bottom of them; as drawn they are much deeper than wide, but their proportions are apparently an accidental conception of the draughtsman. The specification is elastic; it provides that the spaces around the posts shall be large enough to leave spaces around the posts 52 52a thus preventing contact. Such spaces might be very much larger than Fig. 4 shows and still fit into the combination of the patent. So, too, the thickness of the lower plate 58 is the draughtsman's accidental selection. The specifications state merely that it is a lower plate or disk between the porcelain and a shoulder in the tube. It might just as well have been shown in the drawing as one-fourth the thickness indicated in Figure 4 and would then be all that the patent calls for. But if its thickness were reduced, the depth of the recesses would also be reduced, and with an enlargement of the clearance spaces the recess of Canfield would entirely disappear from the Sainsevain drawing, while the drawing would still remain a perfectly accurate picture of the description which Sainsevain gave of his invention.

To predicate anticipation on such accidental resemblances found in drawings only would be to extend the doctrine of the Consolidated Bunging Case, supra, too far. In that case mere shape and proportions were matters of no importance, the containing chamber of the patent there in suit, so long as it was capable of holding water around a valve, might be of any shape, or size, or proportions; therefore a prior containing chamber having that capability was a good reference, whatever its shape, or size or proportions. In Canfield's patent, however, the proportions of the recess constitute the gist of the invention. It will not be necessary to discuss in detail the other similar references to patents of the prior art. We do not find that any of them in the specifications and claims call for a recess between electrodes which enter a sparking chamber, the proportions of which recess are made

a feature of the patented structure, and which recess will, in fact, function as does that of the Canfield patent.

It is next contended that the patent in suit taught the art nothing of value, because it did not indicate what insulating material should be used. Porcelain was well known in this art as an insulator; it was used in prior devices and is used to-day. Naturally it would be the material which one skilled in the art would select if he were to build a spark-plug according to the instructions of the patent. Respondent's expert testifies that when made in large masses porcelain is neither electrically nor mechanically strong enough to meet the strains to which a spark-plug is exposed. The patent states, as we have seen, that a recess for a quarter-inch diameter electrode works satisfactorily by being half-inch diameter by one and a quarter inches deep: Assuming this to be the diameter of recess shown in the *drawings* of the patent and using it as a scale, the witness figured out that the size of the insulators of the patent would be some 3 to 4 inches in diameter and further testified that efforts to produce porcelain insulators of that size which would stand up to their work proved a failure. We find this evidence unpersuasive. If such large masses of porcelain did not work, the natural thing to do would be to reduce their size. The specifications do not require a slavish adherence to the proportions shown in the drawings. If a quarter-inch electrode requires a half-inch recess, an eighth-inch electrode would presumably be accommodated by a quarter-inch recess, which would reduce all other proportions by half. Moreover the patent is not restricted to two recesses, one around each electrode. The claim includes "a recess * * * around the *electrode* or electrodes."

The very "Gas-Maschine" so much relied on (assuming that its casings were imperforate) shows a recess surrounding one electrode (which electrode is embedded in porcelain of apparently the small dimensions of that in the modern spark plug) while the other electrode is seated on the metal casing. The teaching of the patent is that there shall be a recess of proportions to trap air *between* the two electrodes. It seems to us that a skilled mechanic, familiar with the prior art as shown in this record, would have had no difficulty in securing such recess and at the same time using a porcelain insulator of a size small enough to be stable.

As to infringement: We do not understand that there is any real contention as to infringement of the first claim. All the spark-plugs of defendant which are complained of have the specific recess of Canfield. It is asserted that some of them nevertheless get foul, which to us seems immaterial. Much of the briefs is devoted to a discussion as to the meaning of the second claim. It is unnecessary to consider it, since infringement of the first claim is sufficient to entitle complainant to whatever relief it may be entitled to.

It is further contended that relief should be denied the complainant because of the laches of his predecessors in title; he was prompt enough himself, but, of course, is affected by any laches of prior owners. The patent was granted October 18, 1898. Canfield died March 12, 1899, and the patent was held by his administrator till March 13,

1901, when it was transferred to patentee's brother, Charles J. Canfield. He assigned it December 3, 1903, to E. D. Wheeler, who on March 12, 1906, assigned to Association Patents Company, a corporation not engaged in the business of manufacturing or selling engines or spark-plugs. The corporation assigned the patent to complainant March 25, 1909. Suit was begun in September, 1909.

[3] Infringement began in 1901 and was continuous thereafter by various manufacturers. One company sold 50,000 of one type between 1901 and 1904, and, though no specific figures are given of sales of other infringing types, there is evidence that such were sold in large quantities on the open market and were well known to the automobile trade. There is no direct evidence that any of the successive holders of the patent prior to complainant knew of these infringing sales; none of them was examined. Some were dead. There have been cases where all relief has been refused to patent owners who were negligent about enforcing their rights for a long period of time. Richardson v. Osborne (C. C.) 82 Fed. 95, affirmed by this court 93 Fed. 826, 36 C. C. A. 610. These cases have been such as presented "unusual conditions or extraordinary circumstances"; usually with knowledge of infringement the owner of the patent has stood by and, without objection or warning, has allowed the infringer to invest his money in a plant for manufacturing infringing devices. Under the principle enunciated in Menendez v. Holt, 128 U. S. 523, 9 Sup. Ct. 143, 32 L. Ed. 526, we find nothing in the case which would call for a denial of injunctive relief, postponed perhaps for some short period, such as 30 days, so as to give defendant opportunity to arrange its business accordingly.

As to any claim for profits and damages, however, the case is peculiar. As we have seen, there is no direct proof that any of the successive owners actually knew of infringement. It is argued that they could not have known of open and notorious infringement, because they were none of them in the business of making and selling engines or spark-plugs. In that respect the case is peculiar. Usually patents are held by persons whose business is of a sort that the patent pertains to; here the owners were not engaged in any such business. The patentee was a lumberman; his administrator was a trust company; his brother was a lumberman; Wheeler was a mechanical engineer; the Association Patents Company was a mere holding company. None of these successive holders made any use of the patent, except that the patentee made two or three spark-plugs for use in his own power pleasure boat. None of them manufactured any of these spark-plugs, nor did they procure any to be manufactured, nor did they sell any, nor did they, as far as appears, make the slightest effort to induce any one engaged in the automobile industry to make such plugs on some basis of royalty. During this long period the successive owners treated this patent as if it were of no importance whatever, of no use to any one. Apparently they made no effort even to ascertain if there were any infringements of it, or to caution or warn anybody against infringement. The infringement was not an act done in a corner; had the owner taken the trouble to send a competent man to the warerooms of a few dealers in automobile supplies (of this sort), or to any of the

periodical automobile shows, where manufacturers send their devices and point out their claimed advantages, there can be little doubt that infringement would have been discovered years ago. An advertisement in some of the trade papers to the effect that the owners of this patent would prosecute infringers might have warned the trade that. this patent was not, by its owners, regarded as a thing of no account, in which they took no interest. It might well be that, had some such. announcement been made, infringing manufacturers would long ago have modified their devices so as to avoid infringement, as they could easily do by making the depth of the recess less and its width greater,. thus avoiding the specific proportions which constitute the essential part of the patentee's claim.

Where owners have remained thus supine for many years, shutting their eyes to what was going on in the art to which the patent belonged, and thus leading defendants and others to suppose that they intended to make no claim that their patent dominated a portion of that art, it seems to us inequitable that they should come at. this late day and insist on being granted an accounting for damages and profits. during their long period of inaction.

The decree is reversed, with half costs of this appeal, and cause is. remanded, with instructions to decree in favor of complainant on the first claim, with an injunction, but without any accounting for profits or damages, and one-half costs to complainant.