**PROCTER & GAMBLE CO. v. J. L. PRESCOTT CO.**

**J. L. PRESCOTT CO. v. PROCTER & GAMBLE CO.**

Nos. 6249, 6264.

Circuit Court of Appeals, Third Circuit.
Feb. 2, 1939.

Rehearing Denied April 11, 1939.

Joshua R. H. Potts and Basel H. Brune, both of Philadelphia, Pa., Eugene Vincent. Clarke, of Chicago, Ill., and Charles P. Hutchinson, of Trenton, N. J., for counter-claimant.

Thos. G. Haight, of Jersey City, N. J., Cooper, Kerr & Dunham, and Drury W. Cooper, all of New York City, and Allen & Allen, Marston Allen, Erastus S. Allen, and Dinsmore, Shohl & Sawyer, Frank F. Dinsmore and Walter M. Shohl, all of Cincinnati, Ohio, for plaintiff.

Before BUFFINGTON and BIGGS, Circuit Judges, and WATSON, District Judge.

BIGGS, Circuit Judge. .

Two appeals are presented by the cases at bar. One, No. 6249, is a suit by Procter & Gamble Company against J. L. Prescott Company in which the gravamen of the complaint is that Prescott infringed its rights in the trade mark "Oxydol" by placing upon the market a product called "Oxol", and was guilty of unfair competition in respect to the sales of that product. The second suit, No. 6264, is a cross complaint by Prescott against Procter & Gamble alleging that the latter corporation has in-fringed its rights in the trade mark "Chase-O" by placing upon the market a product called "Chipso", and was guilty of unfair competition in respect to sales of Chipso.

Prescott prayed also for an order requiring Procter & Gamble to deliver up its registration for the word "Chipso" to the Commissioner of Patents for cancellation. To Prescott's counterclaim Procter & Gamble filed an answer and a counterclaim. The counterclaim alleged that Prescott by its own acts and with the intention of profiting by the subsequent confusion made use of a Chase-O package design embrac-ing the distinctive coloring then in use upon the Chipso carton. This counterclaim was struck from the pleading by the order of the court. Substantially similar matter, however, was contained in the answer. The answer further alleges that Prescott did not act with diligence in preventing others from employing the "Chase-O" mark or. simulations of it. The learned District Judge found the contentions of the parties to be without merit and dismissed both the. bill of complaint and Prescott's counterclaim. He also denied cancellation of the mark Chipso, holding this issue to be res adjudicata because of the outcome of the litigation had in the Patent Office and before the Court of Customs and Patent Appeals.[1] From the decree referred to, these appeals were taken by the respective parties to the litigation. We will endeavor to ·dispose of the issues presented in one opinion.

## As to "Oxydol" and "Oxol".

Oxydol, as the bill of complaint alleges and the evidence shows, is a cleanser composed of powdered soap. It is sold in a package, not in a bottle. From the year 1920, in which 470,600 cartons were sold by Wm. Waltke & Company, sales steadily increased until a total carton sale of 92,770,-330 was attained in 1930. In 1931, the sales of Oxydol by carton numbered 68,-304,982. By 1931, Oxydol was being sold by 65% of all grocery stores and in every part of the United States.

Oxydol was first manufactured and sold in 1914 by the Wm. Waltke Company of St. Louis. The Waltke Company created the fanciful name "Oxydol" for the product. In 1922 the Waltke Company spent $42,000 advertising its product. In 1927 Procter & Gamble took over the Waltke Company and Oxydol. Half a million dollars was spent by Procter & Gamble in advertising Oxydol in 1928. · In 1930 and .1931 Procter & Gamble spent over a million dollars a year in advertising Oxydol.

It appears from the testimony that though Oxydol was sold widely throughout the United States, in one area, viz., the New England States, New York, Pennsylvania, Delaware and Maryland, sales did not march proportionately with those in the rest of the country. The sales manager of Procter & Gamble testified that in his opinion the reason why sales of Oxydol in the areas mentioned were less was because of confusion caused in the mind of the average purchaser by the Prescott product "Oxol". It is the substance of the Procter &

---

[1] This litigation is referred to more specifically hereafter.

Gamble's complaint that Prescott has attempted to capitalize and has capitalized upon the confusing similarity of the word Oxol to the word Oxydol in the sales of its product, the purchasing public attributing both Oxydol and Oxol to a common origin, the Procter & Gamble Company.

Oxol. is a liquid and is sold in brown bottles. J. L. Prescott Company commenced to manufacture the solution in 1927 and first placed it upon the market in 1928. It contains a bleaching compound and is in fact a chlorinated solution. It acts chemically. It is a detergent. Oxol possesses disinfectant qualities. Oxol is represented as having a distinct function as a deoderant, disinfectant, cleanser and bleacher, and we think that this representation is borne out clearly by the evidence.

Prior to the actual selection of the name, Oxol, as was testified to by an officer of the Prescott Company, much study was given to the selection of a name for the Prescott product. The same witness testified that the use of the syllable Ox seemed natural for a compound containing sodium hyperchlorid since that chemical is frequently used as an oxidizing agent. It was shown that Prescott possessed a trade name Oxidoff formerly used in connection with a metal polish, and also had manufactured an oil called Lubrol. Many examples of registered trade marks containing the Ox syllable were put in evidence by the Prescott Company. The word Oxidol for use in connection with antiseptic powders was registered in the United States Patent Office in 1907. Oxygenol was registered in 1905 for bleaching 'and washing compounds. It was shown that Webster's dictionary of the year 1913 contains both Oxindol and Oxygonal and many words beginning with Ox.

Upon May 27, 1931, the United States Court of Customs and Patent Appeals in the case of Procter & Gamble Co. v. J. L. Prescott Co., 49 F.2d 959, 960, denied Prescott the right to register the mark Oxol. Mr. Justice Bland in delivering the opinion of the court stated: "It was admitted in argument before this court that the applicant deliberately selected the mark 'Oxol' after considering the legal effect of doing so, in view of the registered trade-mark 'Oxydol,' and, while applicant does not admit that it selected 'Oxol' with the purpose of profiting by the advertisement and good will of the 'Oxydol' trade-mark, there is no attempt at explanation as to why the word 'Oxol' was adopted, and it seems fair to infer that, owing to the peculiar character of the two arbitrary marks, and in the absence of any explanation whatever, applicant sought to profit by the confusion that would result." The court then refers to Lever Bros. Co. v. Riodela Chemical Company, Cust. & Pat.App., 41 F.2d 408, which goes off upon the ground that the defendant corporation possessed a tortious motive in using a confusing mark.

Further facts must be considered. In the latter part of 1931, Prescott began advertising Oxol by radio broadcasts. A typical broadcast over Station WABC, upon November 24, 1931, we think should be summarized. Early in the broadcast. emphasis was laid upon the efficacy of Oxol for washing clothes and the fact that it would produce suds without rubbing "* * * to make that washing snowy white." Reference was made to the brown bottle, to the spelling of the word and to the fact that Oxol is neither powder nor soap. It was then stated in the broadcast, "When you buy a bottle of Oxol, take the label off and send it to the Oxol trio in care of this Station, or address your letter to the J. L. Prescott Company, Passaic, New Jersey. * * * In return, they will send you the gaily colored "Oxol" rag doll that children love. * * * And don't forget to send in an Oxol label for one of those little Oxol Rag Dolls." The substance of this broadcast was repeated many times. Upon several occasions radio announcers referred directly to the "Oxol doll". Instructions for completing the "Oxol doll" were sent to all who requested the doll from the Prescott Company.

It is obvious that when the tongue pronounces the words "Oxol doll", or when the mind operates to put these two words together, a connection in thought between Procter & Gamble's product and Prescott's product is inescapable. Such a connection must have occurred to the Prescott Company. Why then was such advertising made use of? The answer is obvious. Ground for mistake in the public mind as to Oxydol and Oxol was well laid and the resulting confusion may not be described as a coincidence.

Confusion as to which company was offering the doll in return for the label immediately came to pass and this was admitted by one of Prescott's officers. Many housewives sent Oxydol labels to Procter

& Gamble and demanded the Oxol doll. An examination of the letters in evidence seems to indicate that the persons writing them were ordinary members of the purchasing public. One housewife wrote, "Am sending the clip off of the Oxydol box. Would you please send us one of your rag dolls * * *". Another wrote, "Enclosed is a clipping from Oxydol. Kindly send me a rag doll, as promised over Radio." The requests quoted seem typical:

Other evidence is even more indicative of confusion between the two products. Some grocery stores confused Oxydol with Oxol and in fact offered one for the other. Community Stores, Inc., and The Great Atlantic and Pacific Tea Co. were chain stores which offered Oxydol by the bottle, indicating that they had confused it with Oxol. Numerous grocers offered testimony of their confusion between Oxydol and Oxol. The confusion of names and products extended therefore to the trade itself.

A manager of a store of the A. & P. Company testified, "My experience in handling the products 'Oxydol' and 'Oxol' is that in the educated class of people they come in and know the product, but more particularly in the average class they are coming into the store and asking for 'Oxydol' and 'Oxol' and the two names become confusing oftentimes. I have had them, particularly when coupons were issued, to come in with an 'Oxydol' box and insist on 'Oxol'; that is particularly true with the coupon; they will come in and insist on 'Oxol', claiming that they should be given 'Oxol'. It also has a tendency to confuse the clerks at times, more especially when they are asking for 'Oxol' or 'Oxydol'; they probably go to the shelf and pull down 'Oxydol' when they should have given them 'Oxol'. Confusion like that has been happening in the store of which I am the manager for about the past year."

A grocer operating a small store testified, "I have found them (Oxydol and Oxol) very conflicting; several times customers would come into the store and ask for one thing and mean another. I have got them mixed up myself."

One witness testified as to why she confused Oxol and Oxydol, "To tell you the truth, I always thought they were made by the same concern, because they are so near alike, you know." This statement was not made in respect to the mailing of a label.

It was said in regard to purchases made by the witness in the market. Testimony to similar effect frequently occurs in the record. Some members of the purchasing public seem to consider Oxol to be the liquid form of Oxydol.

Investigating crews engaged by Procter & Gamble encountered like confusion in the public mind. Independent market research investigations demonstrated a similar result. Though testimony to the opposite effect appears in the record, we reach the conclusion that the confusion which resulted was not the result of the stupidity of individual purchasers, but was to be expected by reason of the similarity of the names of two products and the confusion was heightened by the advertising upon which the Prescott Company embarked.

An examination of the wrappers of the two products yields the following:

| Oxydol | Oxol |
|---|---|
| "Oxydol can be used with equal pleasure and good results in the laundry, kitchen and for general household purposes. | "Buy two bottles of Oxol, keep one in the bathroom, the other for the kitchen and laundry, both ready always for any emergency in any room, anywhere! |
| "Oxydol makes white goods whiter. | "Oxol makes clothes snowy white, it washes, bleaches and removes ordinary stains from white linen or cotton fabrics. |
| "Something different, it is neither a soap powder nor a powdered soap in the understanding of those terms. | "Oxol works equally well with bar soap, flakes or chips. |
| "To use Oxydol according to directions is the easiest way and will give splendid results. | "Oxol takes the drudgery out of laundry. |
| "Cleans everything, for very greasy or dirty articles of any kind, Oxydol is a marvel. | "Oxol cleans and at the same time disinfects handkerchiefs, infants' clothes, towels, etc. |
| "For walls, painted or varnished surfaces. | "Oxol cleans painted woodwork and takes off that smoky film which often settles on white-painted stairways, doors, hallways and wall boards. |
| "Oxydol makes cut glass sparkle. | "Oxol cleans windows. It makes cut glass and crystal ware, mirrors, china and ordinary glassware sparkle like new." |

We think that it is plain from the advertising exhibits in evidence and from the printing upon the wrappers of the two products that they are to be used in the same general household operations, namely, laundering clothes and linen, cleansing painted surfaces, cleaning glass. The field of both Oxol and Oxydol is, therefore, in household cleaning. We are aware that Oxol possesses powers as a disinfectant and deodorizes and sterilizes, while Oxydol is a soap, but both function in the same field or fields which are closely allied.

■ We are convinced that the view of the problem taken by the learned District Judge is too narrow. The test laid down by the trial court was as follows, "The question under all of the evidence, then, is, would an ordinarily intelligent person, one of the purchasing public, be confused in making purchases, taking into consideration the name, the product, the size and style of package and bottle, the advertised uses appearing on the bottle and the different names of manufacturers, to the extent that he or she would believe that a bottle of 'Oxol' was a package of 'Oxydol'". To put this test, which is correctly phrased, more briefly, it is simply whether or not an ordinary person would confuse the two products or entertain a belief that Oxol was a liquid form of Oxydol. The evidence shows that in fact ordinary members of the purchasing public were so confused. Moreover, we think that such a result was inevitable.

■ In our opinion, infringement of trade mark and unfair competition by the Prescott Company has been proven by Procter & Gamble Company. This aspect of the case at bar is governed by the principle enunciated by this court in Kotabs, Inc. v. Kotex Co., 3 Cir., 50 F.2d 810, and which need not be quoted here. See, also, Willys-Overland Co. v. Akron-Overland Tire Co., D.C. 268 F. 151, affirmed 3 Cir., 273 F. 674; Vogue Co. v. Thompson-Hudson Co., 6 Cir., 300 F. 509; Wall v. Rolls-Royce Co., 3 Cir., 4 F.2d 333; Rosenberg Bros. & Co. v. Elliott, 3 Cir., 7 F.2d 962, 963.

Prescott will be enjoined from selling its product or offering it for sale under the name of "Oxol". An accounting of profits had by Prescott and of Procter & Gamble's damages is ordered.

### As to Chase-O and Chipso, upon Issues Raised by the Counterclaim.

Chase-O, manufactured and sold under a registered trade mark by J. L. Prescott Company, is a water softener, composed of phosphates, blue coloring and water in crystalline form. It is sold by package and is advertised as an aid to soap. It is designed to be used with soap as a softener and blueing. In its counterclaim Prescott alleges that Procter & Gamble has infringed the trade mark and is guilty of unfair trade practices by selling its competing product, Chipso.

A brief history of Chase-O is as follows:

In 1912, Lucius A. Williams marketed "* * * a detergent preparation in crystal form, for washing, cleansing, and the harmless bleaching of clothes." This product was laundry crystals. The imaginative name "Chase-O" was given to it and the trade mark was registered in the United States Patent Office on December 9, 1913. A corporation, Chase-O Manufacturing Company, was formed and was in fact the registrant. In 1918 the Chase-O Manufacturing Company went through bankruptcy and the A-1 Manufacturing Company bought the assets of the former company, including trade mark and good will. From time to time changes were made in the formula of the product but it retained its character, of an agent to be used in the washing of clothes. The A-1 Company built up a business of some size in selling Chase-O. From 1920 until the time of the suit substantial sums were spent in advertising the product and many sales were made of it. In the year 1920 the total advertising amounted to over $41,000 and the total sales for that year exceeded $64,000. Chase-O was taken over by Prescott in 1924.

Chipso, manufactured and sold by Procter & Gamble, is composed of anhydrous soap to the extent of approximately 92% of its full content. Insoluble alcohol and water in crystalline form make up its remaining parts. It is simply chipped soap. It is used extensively in washing machines and for soaking clothes.

Both products are sold in packages or cartons. Chipso is sold in cartons of two sizes and the smaller of these is much larger than the Chase-O package. The colors upon Chase-O and Chipso packages are not dissimilar, but the arrangement of

colors is different as was pointed out in the opinion of the Court below. Procter & Gamble prints the word Chipso across the face of the carton in large letters against a contrasting and broad ribbon or background, this ribbon or background extending diagonally across the face of the package. Chipso boxes bear a legend, "For all cleaning", and below or upon the sides are printed the phrases, "Quick Chipso Suds. For the wash boiler. For the dish pan. For the washing machine and for soaking clothes over night."

■ Chase-O is sold in a much smaller package than Chipso but the word Chase-O is printed across its face in a diagonal ribbon in an arrangement very similar to that of Chipso. It is the contention of Procter & Gamble that Prescott itself has caused confusion by simulating a label very similar to the Chipso label upon its Chase-O cartons. There is some evidence to bear out this contention, but in our opinion the evidence of confusion resulting from this change in the Chase-O label is insufficient to prove the point.

Analysis of the evidence of record demonstrates that there is confusion in the minds of the public and of the trade in respect to Chase-O and Chipso, a confusion very similar to that which exists in respect to Oxydol and Oxol. The district manager of Procter & Gamble testified in respect to the names of the two products, "I think that where you have two names, with a lot of similar letters, both starting in ch and ending in o, that just taking the euphonic side alone there must be some little confusion, but I think you have also got to take into consideration the fact that there is another syllable in the word." The witness then went on to elucidate a distinction as to significance, saying that Chase-O would be thought of as a chaser of dirt while Chipso would be deemed a chipped soap.

There is much similarity between the evidence offered in the controversy now under discussion and that received in the record in the Oxydol-Oxol suit. As in the latter case grocers testified that they were confused by the similarity of the two names. In this connection the testimony of Fried, a grocer of York, Pennsylvania, is typical. He was asked upon cross examination as to why he discontinued selling Chase-O. He replied, "Well, I tell you why I discontinued it; I hadn't much call for it; it got confused when the 'Chipso' came out and naturally being a bigger package and the name so near alike that they would come in and ask for one and get the other. Well, it was quite a few of them would come in and ask for 'Chipso' and you hand them that, they would say, 'No, I don't want that; I want the other,' and just vice versa or the other way. This confusion commenced, I think, it was in 1928. I am not positive; along 1927 or 1928. I could not tell you exact. It was when 'Chipso' was advertised so thoroughly throughout our section it became more. The children would come and ask for soap and we would ask, 'What do you want?' and they would say, 'Chipso', and they would take it and bring it back and we would send them the other. They would say they wanted 'Chase-O'. Those were the conflicting things we had, and eventually it went out. I did not have any call for it at the time."

Housewives gave similar testimony as to their confusion between the two products. Such testimony is illuminating. One purchaser stated that she had received Chipso by mistake for Chase-O at her grocery store and used it over a period of six months before she became aware of the difference. Saleswomen and salesmen testified that in selling Chase-O from door to door housewives frequently informed them that they already had Chase-O and that the package in which it was contained was larger than that which the salesman offered. Upon production of the package referred to it was found to be a Chipso carton. Investigators hired by Prescott testified to great confusion of the public mind. There is evidence of decreasing sales of Chase-O and of growing sales of Chipso despite the increased advertising of the former.

Set out below in the parallel column are advertisements used by the two companies to sell Chase-O and Chipso:

| Chase-O | Chipso |
|---|---|
| "Wash the Easy Way. | "Makes all washing easier. |
| "Saves time—Saves Labor—Saves Clothes. | "Saves time, saves work, saves clothes, saves money. |
| "Chase-O Washes Everything. | "for all cleaning." |
| "Chase-O Washed Them!" (showing a laundry basket containing clothes.") | "Soaks Clothes Clean" (showing a laundry basket containing clothes)." |

From all of the foregoing it will be observed that Chase-O and Chipso are used in closely related fields, literally in the family wash tub. We think the evidence clearly proves confusion of products and trade names to the extent that persons of ordinary intelligence believed that they were purchasing Prescott's product when they were in fact buying that of Procter & Gamble.

The two names are in fact confusingly similar. The Court of Customs and Patent Appeals so found in Procter & Gamble Company v. J. L. Prescott Co., 77 F. 2d 98, 102. The Prescott Company had petitioned the Patent Office for cancellation of the trade mark Chipso theretofore registered by Procter & Gamble. Cancellation was ordered and an appeal was taken by Procter & Gamble from the decision of the Commissioner of Patents to the Court of Customs and Patent Appeals. Judge Bland in delivering the opinion of the court stated:

"It is our view that the trade-mark 'Chipso,' as registered, so nearly resembled the previously registered and previously used 'Chase-O' mark that there was likelihood of causing confusion and mistake in the mind of the public, and that because of this fact, the appellant was not entitled to the use of the mark at the time of its application for registration thereof, and the same should not have been registered. * * *

"We agree with the decisions of the tribunals below that the marks at the time of registration so nearly resembled each other that likelihood of confusion would result. It is impossible to escape this conclusion * * *."

All other things being equal we would enjoin the use of the word Chipso by Procter & Gamble as the trademark for its product and hold that that company had been guilty of unfair competition. There are other matters to be considered, however, one of which weighs heavily in the balance against the counter-claimant. The pertinent facts are as follows:

Procter & Gamble actively commenced the sale of Chipso in February, 1921. The advertising manager of the corporation testified that he thought it would prove advantageous to the corporation if the company "* * * put up for general laundry and dish washing purposes, and general cleaning, a product in package form similar to the chipped soap we were then selling to laundries in bulk form—by bulk I mean in barrels." In 1919 he made this suggestion to his superiors and in 1920 the product began to be manufactured. In the year 1921 Chipso was offered for sale and was sold in nineteen of the large cities of the United States from Boston to San Francisco, including New York, Philadelphia, Baltimore, Pittsburgh, St. Louis and Dallas. Both the large package and the small package were sold. The record shows that a great deal of promotional work was done. In the year 1921, 8,763 cases of the small size package, packed 100 to a case, and 2,619 cases of the larger size packages, packed thirty-six per case, were sold. In the summer of 1922, 20,894 of the small size Chipso and 17,878 cases of the larger package were sold. Early in 1923 Procter & Gamble, being convinced that they possessed a brand in which great commercial success might be achieved, began efforts to make Chipso a nationally known product. Thereafter the company embarked upon a most extensive advertising campaign, including newspaper advertising, house to house sampling, promotional work with stores, couponing, outdoor advertising, national magazine advertising and radio advertising. The record shows that the house to house advertising covered substantially all parts of the United States, not only the large cities and smaller towns, but also country localities situated around these centers of population. From the years 1923 to 1931, inclusive, Procter & Gamble expended $3,995,000 in having agents make household calls which totalled over 40,000,000 in number. From 1920 to 1931, inclusive, Procter & Gamble expended the sum of $13,954,000 in advertising its product Chipso and to the end of the year 1931 had sold 18,978,007 cases of the product, amounting to a total of 800,000,000 cartons. The product is now carried by 80% of the grocery stores in the United States and it is fair to refer to the extent of the sales made of the product as enormous.

It is inconceivable that the Prescott Company could have remained unaware of Procter & Gamble's product and the extent of its promotional efforts, yet for a period of five years Procter & Gamble proceeded to promote and sell Chipso in ever increasing quantities without objection from the Prescott Company. Indeed, Prescott admits to substantial knowledge of Procter & Gamble's efforts from the year 1924. No suit alleging unfair competition

was filed by Prescott until the counterclaim in the case at bar was presented. Nothing was done by Prescott whereby one might conclude that it objected to Procter & Gamble's promotional efforts on behalf of Chipso until its infringement notice was sent to Procter & Gamble about June 14, 1929.

The sales of Chase-O for the years 1919 to 1930, inclusive, totaled $927,771. In 1919 the sales of Chase-O amounted to ·$47,009. Through the years 1920, 1921 and 1922, sales of the product increased until in the year 1922 they reached a total of $105,194. In 1923 sales were slightly in excess of $100,000; in 1924 they were in excess of $107,000. In the year 1925, the high point, Chase-O sales reached a total of $114,919. Throughout the following years, from 1926 to 1930, inclusive, sales of the product steadily declined until in 1930 they totalled only $26,463.

From the years 1919 to 1927, inclusive, Prescott and A-1 Manufacturing Company expended a total of $585,819 upon advertising and selling Chase-O. In this period $116,881 was expended upon procuring samples. $89,412 was expended in cost of distributing them. Newspaper advertising totalled $102,758. General advertising amounted to $27,024, while the matter used in advertising cost $48,000. $7,013 was expended in redeeming coupons.

Prescott's Chase-O was in fact a failing business from 1926 until 1930. If this failure had been in fact due to acts of Procter & Gamble complained of, it was to be expected that Prescott would have expressed its objections to Procter & Gamble's course of conduct and would have brought that company to the bar of justice long before the time of the filing of the counterclaim in the instant case.

█ We reach the conclusion that Prescott by its own course of conduct, whether that be designated as acquiescence or· laches, has estopped itself from asserting the rights which it seeks to enforce by means of its counterclaim. In reaching this conclusion we are not unmindful of the principle enunciated by the Supreme Court in Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526, and in McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828, wherein it was held that while unexplained delay upon the part of the plaintiff might destroy the obligation of the defendant to account none the less relief by way of injunction was still open. In Menendez v. Holt, there

was bodily appropriation of the trade mark by the defendant constituting actual and continuing fraud. That the decision in Menendez v. Holt went off upon this ground is made apparent by the decision of the Supreme Court in Saxlehner v. Eisner & M. Co., 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60.

█ In the case at bar there is confusion of trade marks and products, but the record is devoid of evidence which could lead to the conclusion that Procter & Gamble has attempted to palm off or in fact has palmed off Chipso as Chase-O. There is no evidence similar to the "Oxol doll" testimony in the Oxydol-Oxol controversy. We think that it is the case that Chipso, pushed by a larger and perhaps more energetic organization than that of Prescott's, in effect has engulfed Chase-O in so far as the markets for the two products have coincided or overlapped. Had the Prescott Company attempted to assert its rights by suit before the efforts and expenditures made by Procter & Gamble to exploit Chipso, we conceive that it would have been entitled to injunctive relief. As it is,' however, we consider that the controversy now under ·discussion is ruled by the principle enunciated in the decision of the Supreme Court in Creswill v. Grand Lodge Knights of Pythias, 225 U.S. 246, 261, 32 S.Ct. 822, 827, 56 L.Ed. 1074, where it was said, "It is undisputable that the court was clearly right, as a matter of law, in holding that a court of equity in any event would not afford relief where there had been such laches as would cause it to be inequitable to do so." The language of the court in Old Lexington Club Distillery Co. v. Kentucky Distilleries & Warehouse Co., D.C., 234 F. 464, 469, seems singularly appropriate and applicable to the case at bar.

"It would, in my judgment, be most inequitable to interfere with the defendant's trade under the circumstances of this case. The plaintiff has known of the defendant's use of its trade-name, 'and has taken no steps whatsoever to prevent it for at least 15 years, during all of which time defendant has been building up its business, which is far greater and more extensive than that of the plaintiff. For one to permit another to build up a reputation for one's goods under a trade-name for a long period of time, and then ·to assert an exclusive right to that name, and thereby acquire the benefit of the reputation and trade which the other has built up, when it lay in the pow-

er of the former at any time to have arrested the use of the trade-name by the latter, seems to me most inequitable, because, if the right had been asserted before the reputation was acquired, the infringer could have adopted another name and built his reputation on it. It would also tend to further deception upon the public, one of the results which injunctive relief in trade-mark cases seeks to prevent. Of course, if one knowingly and willfully adopts a name which has been used by another, a different situation might be presented. Such a case would exhibit actual fraud, and such, I think, is the distinguishing feature between cases such as this and Menendez v. Holt, supra. See Saxlehner v. Eisner & Mendelson, supra, 179 U.S. [19], 39, 21 S.Ct. 7, 45 L.Ed. 60. But nothing of that kind appears in this case."

It should be noted that in the instant case no evidence is offered from which it may be found that Procter & Gamble had knowledge of the exploitation of Chase-O by the Prescott Company.

In the case of Valvoline Oil Co. v. Havoline Oil Co., D.C., 211 F. 189, 194, Judge Mayer, holding that laches barred the right to the injunctive relief sought by the plaintiff, sets forth a statement of the law which we believe to be precisely applicable to the case at bar.

"I think we must realize modern conditions. Men can build up new businesses these days in a period of time which would have seemed amazingly short years ago. It is true that mere acquiescence will not preclude injunctive relief, but, whether a case falls within the principle of Menendez v. Holt, 128 U.S. [514], 523, 9 S.Ct. 143, 32 L.Ed. 526, or within Richardson v. D. M. Osborne & Co. (C.C.) 82 F. 95, affirmed 93 F. 828, 36 C.C.A. 610, depends, of course, on the particular facts and circumstances. Where a trade-mark is bodily appropriated, as in Menendez v. Holt, the courts will grant injunctive relief, although in some instances denying an accounting. See, also, Mosler & Co. v. Lurie, 209 F. 364, 126 C.C.A. 290 (C.C.A.2d Circuit) decided November 11, 1913. But this is not such a case. It must be admitted, even if it were to be held that the defendants infringed complainant's trade-mark, that the question involved is seriously debatable.

"I am of opinion that equity as applied to modern business developments requires that, in this particular case, injunctive relief in any event be denied. No satisfactory explanation is given for the delay, and, during that time, the defendants have spent thousands of dollars to create a valuable asset in the word 'Havoline.' Complainant is not uninformed, as in Mosler & Co. v. Lurie, supra, but is a business corporation in this very same kind of business.

"There are cases where delay is excusable because it is necessary to obtain essential testimony or because a person unfamiliar with the subject-matter is ignorant of his rights, or where there is some situation that shows that a defendant should not be permitted to go on with his own wrongful conduct just because he has continued it for a long time.

"But it cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be and then destroy with the aid of a court decree much that the competitor has striven for and accomplished—especially in a case where the most that can be said is that the trade-mark infringement is a genuinely debatable question."

The delay of the Prescott Company in pressing for relief is unexplained. This fact must weigh heavily in the balance against it and for this reason and for the reasons stated heretofore injunctive relief must be denied. See Fleet Co. v. Mobile Drug Co., 5 Cir., 284 F. 813; France Milling Co. v. Washburn-Crosby, 2 Cir., 7 F. 2d 304.

### As to the Cancellation of the Trade Mark Chipso

The Prescott Company in its counterclaim prayed that the trade mark registration for Chipso be "* * * delivered up to the Commissioner of Patents for cancellation". In its answer to the counterclaim Procter & Gamble prayed that the counterclaim be dismissed. The District Court in the third paragraph of its decree ordered, "That the part of said counterclaim in which is set forth the alleged cause of action upon which is based the prayer thereof for an order that 'the certification of registration of the plaintiff for the word "Chipso" No. 141,205, be delivered up to the Commissioner of Patents for cancellation', be dismissed upon the ground that the decision of the United States Court of Customs and Patent Appeals affirming the order of the Commissioner of Patents that such certificate of

registration be so cancelled is res adjudicata."

Procter & Gamble takes the position that the question of cancellation of the trade mark of Chipso is not res adjudicata, that the court below possessed the power, despite the determination of this question by the Commissioner of Patents and the decree of the Court of Customs and Patent Appeals in the case of Procter & Gamble Co. v. J. L. Prescott Co., supra, to proceed to determine this question anew and require the Commissioner of Patents by an appropriate decree to permit the registration Chipso to remain upon the register of trade marks.

The Prescott Company contends that since Procter & Gamble prayed that Prescott's counterclaim be dismissed and has received that relief, it may not now appeal to this court upon the issue of cancellation of the trade mark Chipso. In support of this position the Prescott Company cites Guarantee Company of North America v. Phenix Insurance Company, 8 Cir., 124 F. 170, 173; Commissioner v. Kelly's Estate, 7 Cir., 84 F.2d 958; Ottenheimer Bros. v. Libuwitz, 4 Cir., 74 F.2d 858 and similar cases.

Procter & Gamble for its part urges upon us that since the court below found that Procter & Gamble had the right to use the trade mark Chipso and that there had been no confusion with or infringement of Prescott's mark, the dismissal of the counterclaim, without determining that Procter & Gamble had the right to retain the trade mark, failed to give Procter & Gamble the relief to which it was entitled and therefore it may appeal. Procter & Gamble also points out that by its counterclaim to Prescott's counterclaim (dismissed by the court below under the rules of pleading) it attempted to bring to issue its right to the re-instatement of its trade mark and that therefore it did all that it could do by way of pleading to maintain itself on that issue.

These questions, some of which are procedural, we think can be resolved by an examination of the substantial issues in dispute.

Procter & Gamble sought to have the court below pass upon the issue of the cancellation of the trade mark under the provisions of the Act of February 20, 1905, c. 592, Sec. 22, 33 Stat. 729, 15 U.S.C.A. § 102, which provides, "Whenever there are interfering registered trade-marks, any person interested in any one of them may have relief against the interfering registrant, and all persons interested under him, by suit in equity against the said registrant; and the court, on notice to adverse parties and other due proceedings had according to the course of equity, may adjudge and declare either of the registrations void in whole or in part according to the interest of the parties in the trade-mark, and may order the certificate of registration to be delivered up to the Commissioner of Patents for cancellation."

The statute under which the Prescott Company brought its proceedings for cancellation of registration in the Patent Office is the Act of February 20, 1905, c. 592, Sec. 13, 33 Stat. 728, 15 U.S.C.A. § 93, which provides, "Whenever any person shall deem himself injured by the registration of a trade-mark in the Patent Office he may at any time apply to the Commissioner of Patents to cancel the registration thereof. The commissioner shall refer such application to the examiner in charge of interferences, who is empowered to hear and determine this question and who shall give notice thereof to the registrant. If it appear after a hearing before the examiner that the registrant was not entitled to the use of the mark at the date of his application for registration thereof, or that the mark is not used by the registrant, or has been abandoned, and the examiner shall so decide, the commissioner shall cancel the registration. Appeal may be taken to the commissioner in person from the decision of examiner of interferences."

Jurisdiction of the Court of Customs and Patent Appeals to take such appeals as that which came before it in the case of Proctor & Gamble Co. v. J. L. Prescott Co., supra, is conferred upon it by the provisions of the Act of February 20, 1905, c. 592, Sec. 9, 33 Stat. 727, 15 U.S.C.A. § 89, which provides, "If an applicant for registration of a trade-mark, or a party to an interference as to a trade-mark, or a party who has filed opposition to the registration of a trade-mark, or party to an application for the cancellation of the registration of a trade-mark, is dissatisfied with the decision of the Commissioner of Patents, he may appeal to the Court of Appeals of the District of Columbia, on complying with the conditions required in case of an appeal from the decision of the commissioner by an applicant for patent, or a party to an interference

as to an invention, and the same rules of practice and procedure shall govern in every stage of such proceedings, as far as the same may be applicable." In the case of Baldwin Co. v. Robertson, 265 U.S. 168, 179, 44 S.Ct. 508, 510, 68 L.Ed. 962, the Supreme Court stated in respect to the right of the Baldwin Company whose trade mark had been cancelled in the Patent Office, "The next inquiry is whether in addition to such appeal [then to the District Court of Appeals [3]] and after it proves futile, the applicant is given a remedy by bill in equity as provided for a defeated applicant for a patent in section 4915, R.S. We have in the cases cited given the closing words of section 9 [15 U.S.C.A. § 89] a liberal construction in the view that Congress intended by them to give every remedy in respect to trade-marks that is afforded in proceedings as to patents. * * It is not an undue expansion of that construction to hold that the final words were intended to furnish a remedy in equity against the Commissioner in every case in which by section 9 an appeal first lies to the Court of Appeals."

■ R.S. § 4915, however, was amended by the Act of March 2, 1927, c. 273, Sec. 11, 44 Stat. 1336; Mar. 2, 1929, c. 488, Sec. 2 (b), 45 Stat. 1476, 35 U.S.C.A. § 63, so that the remedy of a bill in equity remained to him who was aggrieved by the decision of the Commissioner of Patents unless an appeal has been taken to the United States Court of Customs and Patent Appeals which is pending or has been decided as in the case at bar. It is apparent therefore that Procter & Gamble possesses no right to maintain a bill in equity under R. S. § 4915 as amended.

Its contentions lie in a different direction, however, and if we correctly apprehend its position, Procter & Gamble contends that by the provisions of Section 102 of Title 15, U.S.C.A. heretofore quoted the court possessed the power according to the course of equity to adjudge and declare either of the two conflicting registrations void according to the interest of the parties in the trade mark. It further takes the position that the decisions of the Court of Customs and Patent Appeals have no more force than those of the Patent Office itself. It cites Postum Cereal Co. v. California Fig Nut Co., 272 U.S. 693, 698, 47

S.Ct. 284, 285, 71 L.Ed. 478, wherein the Supreme Court stated, "The decision of the Court of Appeals under section 9 of the act of 1905 is not a judicial judgment. It is a mere administrative decision. It is merely an instruction to the Commissioner of Patents by a court which is made part of the machinery of the Patent Office for administrative purposes." It cites also Parker-Kalon Corp. v. Coe, 66 App.D.C. 252, 86 F.2d 31, and Hygienic Products Co. v. Coe, 66 App.D.C. 98, 85 F.2d 264, and contends that therefore the decisions of the Patent Office (which includes the decision of the Court of Customs and Patent Appeals) did not render the issue presented res adjudicata in the court below.

In other words, Procter & Gamble contends that a proceeding under Section 93 of Title 15 U.S.C.A., though it relate to cancellation of registration and is in fact the Section under which Prescott proceeded in the Patent Office, is more limited in scope than Section 102 which relates to cancellation of registrations already issued and is a much broader inquiry open to equities not available in a proceeding under Section 93.

Procter & Gamble contends that the opinion of the Supreme Court in Baldwin Co. v. Robertson, supra, at page 181, 44 S.Ct. at page 510, casts illumination upon the question before us, since in the cited case Mr. Chief Justice Taft stated, "The argument is made that section 9 [15 U.S. C.A. § 89] should not be held to authorize the use of a suit in equity for all of the four cases in which appeals are provided to the Court of Appeals from the Commissioner and are unsuccessful, because by section 22 of the same Act [under which Procter & Gamble claims its right in the case at bar] there is a special provision for a remedy in equity where there are interfering registered trade-marks. It is said this excludes the inference that such a remedy is also provided in section 9, on the principle 'expressio unius exclusio alterius.' An examination of Section 22 [15 U.S.C.A. § 102] shows that it refers to an independent suit between claimants of trade-marks, both of which have already been registered. The Commissioner is not a party to such litigation, but is subject to the decree of the court after it is entered. It is just like the proceeding in section 4918

---

[3] Now to the Court of Customs and Patent Appeals by virtue of the provisions of the Act of March 2, 1929, c. 488, Sec. 2(a), 45 Stat. 1476; June 7, 1934, c. 426, 48 Stat. 926, 28 U.S.C.A. § 309a(a).

to settle controversies between interfering patents already granted by the Patent Office. Section 9 of the Trade-Mark Act is wider than section 22 in its scope. It includes one who applies for registration of an unregistered trade-mark which interferes with one already registered." Procter & Gamble further points out that an examination of R.S. § 4918 as amended by the Act of March 2, 1927, c. 273, Sec. 12, 44 Stat. 1337, 35 U.S.C.A. § 66, shows that it relates to relief against interfering patents and is substantially similar to the provisions of Section 22 referred to in Baldwin Co. v. Robertson, supra, and that it was not the intention of the Supreme Court in its opinion in the cited case to indicate that Section 9 of the Trade-Mark Act, 15 U.S.C.A. § 89, under which the Prescott Company proceeded in the Patent Office, was exclusive of the remedy prescribed by Section 22 simply because it is broader in its scope, including trade mark interferences upon application for trade mark as well as interferences between trade marks already registered. To continue with the argument Procter & Gamble contends that the right claimed by it under Section 22 is one given by statute and cannot be lessened or done away with by virtue of the fact that the Prescott Company has proceeded pursuant to the provisions of Section 93, 15 U.S.C.A., in the Patent Office, and that Procter & Gamble appealed therefrom to the Court of Customs and Patent Appeals, unless the determination of the issues by the Patent Office and the Court of Customs and Patent Appeals rendered the issues res adjudicata. That this was not the case, they assert, is fully demonstrated by the language of the Supreme Court in Postum Cereal Co. v. California Fig Nut Co., supra, and the other cases referred to above.

 With their last contention we are in accord. We are of the opinion that the issue of the cancellation of the trade mark Chipso was not rendered res adjudicata by the decisions of the tribunals of the Patent Office and the Court of Customs and Patent Appeals. Our difficulty in sustaining Procter & Gamble's position lies elsewhere. It is entirely clear that the statute, 15 U.S.C.A. § 102, under which Procter & Gamble now seeks relief is not available to it for the purpose of conferring jurisdiction upon the District Court to the end that that tribunal should re-instate the cancelled trade mark upon the register of the Commissioner of Patents. The language of the statute confers no such power in that it simply provides that a court of equity " * * * may adjudge and declare either of the registrations void in whole or in part * * *" and provides nothing whatsoever in respect to re-instatement of trade marks already cancelled. In fact in the case at bar, there are not now two interfering registrations since one has been cancelled by administrative action and it is doubtful if a court of equity would have jurisdiction under such circumstances within the purview of the statute.

The questions of pleading therefore may be described as moot or at least not in point upon the real issue presented.

In view of the foregoing (1) the first paragraph of the decree of the court below filed July 23, 1936 is reversed with the directions to reinstate the bill of complaint, to grant relief in accordance with the prayers thereof in conformity with this opinion, (2) the second paragraph of the decree is affirmed, and (3) the third paragraph thereof is modified by striking therefrom the words " * * * upon the ground that the decision of the United States Court of Customs and Patent Appeals affirming the order of the Commissioner of Patents that such certificate of registration be so cancelled is res adjudicata."