54 CCPA

**RALSTON PURINA COMPANY,**
Appellant,

v.

**MIDWEST CORDAGE COMPANY, Inc.,**
Appellee.

**Patent Appeal No. 7720.**

United States Court of Customs
and Patent Appeals.

March 16, 1967.

John D. Pope, III, St. Louis, Mo., for appellant.

A. Yates Dowell, A. Yates Dowell, Jr., Washington, D. C., for appellee.

Before WORLEY, Chief Judge, RICH, SMITH, and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.[*]

RICH, Judge.

This appeal is from a decision of the Trademark Trial and Appeal Board, 145 U.S.P.Q. 348, dismissing a petition to cancel from the Principal Register a registration [1] of the trademark CHECKERBOARD for baler and binder twine.

The registrant and its predecessors have sold baler twine since May 1958 under the trademark CHECKERBOARD. Annual sales were initially about $20,000 to $25,000. They grew to approximately $140,000 to $150,000 in the years 1960–1962. Sales for 1963 were about $50,000. Sales of $75,000 to $80,000 were predicted for 1964.[2] No

---

[*] Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. Registration No. 707,960, issued December 6, 1960, claiming first use May 30, 1958.

2. Testimony on registrant's sales was somewhat imprecise. Mr. Elwood Long, the former president and owner of appellee's predecessor, testified as follows:

Mr. Long, can you tell us some estimate of your volume of sales during the years that you were handling this Checkerboard twine? I believe you said from '58 to late December of '62? A. Well, our smallest years would run twenty to twenty-five thousand starting in '58 and '59. And then the volume grew up to a hundred and forty to fifty thousand in '60 and '61 and in '62.

Mr. Victor Barredo, general manager of registrant also testified on sales:

Q11. And during the time that you have been with that company, have you merchandised twine? A. If I have merchandised twine? Yes, I have.

Q12. Under the trademark "Checker"? A. No. "Checkerboard."

Q13. Checkerboard. During what period of time have you been merchandising twine? When I say "You" I mean the company in which you are its general manager under this trademark

evidence of registrant's advertising expenditures has been introduced.

The petitioner has for many years sold a variety of products including animal feeds, cereals, and farm equipment under numerous trademarks utilizing a checkerboard design or variants of the word CHECKER. Its registrations of these trademarks include registrations for livestock and poultry feeds, bread, baked rye flour products, various other food products, feed containers, watering fountains for animals, insecticides, fungicides, and vermifuges, antibiotics and even magazines. It is petitioner's practice to show the checkerboard mark on all advertising material and printed forms. Its advertising expenditures during the years 1958–1962 were in excess of seventy-two million dollars. Its total sales over that same period exceeded three billion dollars.

Petitioner also owns and operates a chain of rural stores which sell its products and others at retail. The latter are called Checkerboard stores and are identified by a checkerboard design on the store fronts. Customer's receipts bear the checkerboard design. These stores sold binder twine before registrant's first use of CHECKERBOARD. Petitioner has introduced into evidence sales tickets for binder twine from 1956 and 1957.

The board dismissed the petition for cancellation because, in its view,

\* \* \* regardless of any asserted prior rights petitioner is now claiming in its checkerboard design and its registered marks pleaded herein, it has either acquiesced, by acts of omission and commission, to respondent's asserted superior rights in its registered

mark as applied to bailer twine or had taken the past position that there was no confusion in trade because it regarded respondent's product as substantially different from the goods on which it used its mark, or marks.

That conclusion is built upon evidence of the following chronology. Application for the registration in question was filed March 4, 1960, and registration issued December 6, 1960. On March 7, 1961, attorneys for appellee's predecessor, wrote to a supplier of petitioner, objecting to the supplier's shipment of twine under the trademark CHECKER into the United States as an infringement of his company's rights in its registered trademark CHECKERBOARD. On March 29, 1961, petitioner's attorney answered that letter and requested certain information on registrant's mark and its use. In the next two weeks several other letters were exchanged by counsel. Petitioner's counsel then learned that Mr. Long, at that time president and owner of appellee's predecessor, was a valued customer of petitioner and, in response to a suggestion from the sales department, arranged a conference with him, during which petitioner's counsel suggested that Mr. Long contact one of petitioner's buyers to negotiate sales of twine and other products. Mr. Long did so and by May 18, 1961, sold 900 bales of twine to petitioner under the CHECKERBOARD label. Negotiations continued at least into the latter part of June but no further purchases could be agreed upon. In November and December 1961, Mr. Long wrote to petitioner's buyer about prices for the coming season. On December 21, 1961, petitioner's attorney wrote to Mr. Long and

"Checkerboard." A. Since January, 1963.

Q14. And how did you come to commence it at that time? A. The company bought the Checkerboard twine business from Missouri Twine and Equipment Company and Mr. Long.

Q15. You received customer lists from him? A. Yes, I did.

Q16. What were your approximate sales of this particular item in 1963? A. Oh, around—I don't have the exact

figure—but I would say close to fifty thousand dollars.

Q17. Do you have a forecast of your sales for 1964? A. Well, we anticipate an increase and we are figuring that— rather we are getting prepared for an increase to around probably seventy-five or eighty thousand dollars.

We adopt registrant's view for purposes of this opinion i. e., that the testimony refers to sales of *twine* under the CHECKERBOARD trademark.

expressed concern over the use of CHECKERBOARD in the farm supply field. Petitioner no longer sells twine under the CHECKER mark.

The board's analysis of the foregoing led it to dismiss the petition for cancellation. It said:

> In summary, the record shows that petitioner has had actual knowledge of respondent's use and registration of its mark since early in 1961; following such notice, and with the apparent consent of its legal counsel on such matters, it negotiated and subsequently bought "CHECKERBOARD" bailer twine from respondent and discontinued its purchases of "CHECKER" bailer twine from another party. While Mr. Fraser [petitioner's counsel], in his testimony on his recollections as to his dealings with respondent, now takes the inconsistent positions that it was his feeling that the respondent would only use its mark on goods which were sold exclusively to petitioner or that respondent would forego the use of its mark "CHECKERBOARD" if petitioner were to purchase its products, the record fails to support either of these positions. In fact, to the contrary, it indicates that petitioner acquiesced to [in] respondent's asserted superior rights in its mark for bailer twine, and that respondent apparently expanded its business in "CHECKERBOARD" for such goods on the basis thereof. It is concluded that petitioner is precluded by its past actions from now asserting that it will be damaged by the continued existence of respondent's registration of [on] the register.

The registrant, properly, we think, interprets the board's opinion thus expressed to be "that laches or acquiescence amounting to estoppel is present in the case at bar."

The doctrine here invoked has been available in trademark infringement suits at least since McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828 (1877), in which, although an injunction was granted, an accounting was denied because of "acquiescence of long standing" and "inexcusable laches." The circumstances under which an injunction would also be denied became clearer in the subsequent cases. In Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526 (1888), the Court commented on McLean v. Fleming:

> Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, unless it has been continued so long, and under such circumstances, as to defeat the right itself.

These circumstances, the Court indicated, may well arise "where the use by others for a long period, under assumed permission of the owner, had largely enhanced the reputation of a particular brand." The equity of a defendant in his promotional expenditures was soon established. Valvoline Oil Co. v. Havoline Oil Co., 211 F. 189 (D.C.N.Y.1913). It is in this form that the doctrine comes to us. However, the obligation has always been on the infringer to show not only inexcusable delay or apparent acquiescence but also "some reason why it will not be just to stop him." Dwinell-Wright Co. v. White House Milk Co., 132 F.2d 822 (2d Cir. 1943, L. Hand, J.). The registrant, of course, has the right to invoke the doctrine in a cancellation proceeding. 15 U.S.C. § 1069 (1964); Loma Linda Food Co. v. Thomson & Taylor Spice Co., 279 F.2d 522, 47 CCPA 1071 (1960); Halliday, Laches, Acquiescence and Estoppel in Registration Cases, 40 Trademark Rep. 85 (1950). He, however, bears the burden of showing the injustice.[3] *Loma Linda,* supra.

---

3. Former Assistant Commissioner Leeds addressed herself to the problem in *opposition* proceedings. Her comments are instructive:

> Acquiescence relates to one's inaction during another's performance of an act * * * laches relates to delay after an act is done * * *. Both require actual or imputed knowledge.
>
> [P]roof of acquiescence short of an estoppel in an opposition proceeding can avail an applicant nothing.

Salem Commodities, Inc. v. Miami Margarine Co., 106 U.S.P.Q. 411, 414

■ We cannot agree that registrant has here met that burden. It, to be sure, has shown activity on the part of petitioner which, for the sake of argument, may be deemed acquiescence in registrant's use of the mark.[4] But it has not made even a serious effort to show prejudice to itself as a result of petitioner's retreat from that stance. We see no decisions made by registrant in reliance upon petitioner's purported acquiescence. We have no evidence of promotional expenditure. Sales data are too imprecise even to indicate any substantial growth of registrant's trade in the six-month period between petitioner's alleged acquiescence and first assertion of right in the mark for baler twine.[5]

■■ It is probably true that long acquiescence in the use of a trademark by a successful business, even without expansion of trade, may provide a basis for a valid inference of prejudice. See Anheuser-Busch, Inc. v. Du Bois Brewing Co., 175 F.2d 370 (3d Cir. 1949). Logically, we suppose, it must be admitted that each day sees some incremental aggrandizement of good will— each advertising dollar expended adds in some sense to registrant's equity. But a minimal equity thus acquired over such a short period of time as six months has never been enough to overturn another's rights in a trademark. Some substanial prejudice has always been required.

Registrant has cited three cases. In each of these, it seems to us, the injustice in stopping the latecomer's use of the mark was manifest. In Valvoline Oil Co. v. Havoline Oil Co., supra, the combination of an unexcused delay of eight years with advertising expenditures of at least $100,000 persuaded the court that equity forbade an injunction. In Procter & Gamble Co. v. J. L. Prescott Co., 102 F. 2d 773 (3d Cir. 1939), advertising expenditures of almost $14,000,000 were again decisive in light of an unexcused delay of at least five years. Anheuser-Busch, Inc. v. Du Bois Brewing Co., supra, was an extraordinary case in which the infringing business had not expanded at all in 40 years. But the good will acquired and advertising of defendants during that long period, coupled with plaintiff's apparent acquiescence, convinced the court's majority that an injunction would be unfair. We find it impossible to equate these cases with the one at bar. We cannot so lightly find that the registrant was prejudiced. See Meat Industry Suppliers, Inc. v. Kroger Co., 130 U.S.P.Q. 434 (N.D.Ill. 1961).

The parties were asked to file supplementary briefs in which they discussed Alfred Dunhill of London, Inc. v. Dunhill Tailored Clothes, Inc., 119 U.S. P.Q., 325 (S.D.N.Y.1958), a typical case in which prejudice was inferred from long acquiescence. Registrant's comments on that case are of interest:

> While the period of time of the knowledge, cordiality and sales, and apparent acquiescence is much less in the instant case than in *Dunhill*, the present case involves additional facts of significance, namely (a) the demand * * * by registrant that petitioner cease use of the trade-mark; (b) the compliance by petitioner with such demand * * * (c) discussions between petitioner's counsel and registrant's principal subsequent to the reg-

---

(Comm'r.1955) rev'd on other grounds, 244 F.2d 729, 44 CCPA 932 (1957).

4. The petitioner's purchase and precedent negotiations do not, as a matter of fact, seem as unequivocal to us as they apparently did to the board. We note the initiation of the negotiations by counsel for the purpose of resolving a legal problem and the uncontradicted testimony that counsel, as early as June 1961, indicated orally petitioner's interest in protecting the checkerboard mark. We think peti-

tioner's actions were subject to several interpretations. But we do not agree that respondent could justifiably adopt the one most favorable to it without some other assurance (e. g., explicit consent, other purchases, passage of a substantial period of time).

5. We do not find any substantial support in the record as a whole for the board's finding that the respondent "apparently expanded its business" in reliance upon the alleged acquiescence.

istrant's demand, in which no counter demand was made by the petitioner; (d) registrant's apparent right to assume that it was acting properly in view of the absence of any use of petitioner's trademark in any field even remotely analogous to baler twine; and (e) the absence of any confusion. The additional facts recited do not reflect any injustice consequent upon the petition for cancellation. They show neither reliance nor other prejudice. They seem to spring from a vague feeling that it was somehow unfair for the hitherto docile petitioner, of a sudden, to take the offensive.

 Registrant's defense is, after all, an equitable one. We do not scan petitioner's history for one fatal misstep. We sustain petitioner's rights in the absence of a showing that to do so would work *injustice*.

The decision of the board is reversed. Reversed.

WORLEY, C. J., would affirm.