THIS DECISION IS CITABLE
AS PRECEDENT OF THE
TTAB

Mailed: 2/2/06

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Teledyne Technologies, Inc.
v.
Western Skyways, Inc.

_____

Cancellation No. 92041265

_____

Ernest I. Gifford of Gifford, Krass, Groh, Sprinkle,
Anderson & Citkowski for Teledyne Technologies, Inc.

Scott H. Culley and Kimberly E. Lord of Johnson & Repucci
for Western Skyways, Inc.

_____

Before Quinn, Bucher and Zervas, Administrative Trademark
Judges.

Opinion by Quinn, Administrative Trademark Judge:

Teledyne Technologies, Inc. has petitioned to cancel a

registration owned by Western Skyways, Inc. of the mark

GOLD SEAL for "aircraft engines."[1]  As grounds for

cancellation under Section 2(d) of the Trademark Act,

petitioner alleges that respondent's mark, as used in

connection with respondent's goods, so resembles

petitioner's previously used and registered mark GOLD SEAL

_____

[1] Registration No. 2227392, issued March 2, 1999; Section 8 affidavit
filed and accepted.

for "airplane parts, namely ignition harnesses"[2] as to be likely to cause confusion.

Respondent, in its answer, denied the salient allegations of petitioner's claim of likelihood of confusion.  In addition, respondent set forth certain affirmative defenses, including laches, and a Morehouse defense.[3]

The record consists of the pleadings; the file of the involved registration; trial testimony, with related exhibits, taken by each party; respondent's responses to petitioner's first set of interrogatories introduced by way of petitioner's notice of reliance;[4] and petitioner's responses to certain of respondent's interrogatories, certified copies of two other registrations owned by respondent, and photocopies of third-party registrations of GOLD SEAL marks, all made of record in respondent's notice of reliance.  The parties filed briefs.  An oral hearing was not requested.

---

[2] Registration No. 1943566, issued December 26, 1995.
[3] The affirmative defense is worded as follows:  "[Respondent] has a prior registration for the mark GOLD SEAL for similar goods."  The parties have viewed this allegation as a Morehouse defense, and we will consider it as such.  See Morehouse Manufacturing Corp. v. Strickland & Co., 407 F.2d 881, 160 USPQ 715 (CCPA 1969).
[4] Given that the registration sought to be cancelled is automatically of record pursuant to Trademark Rule 2.122(b), petitioner's reliance on a certified copy of respondent's involved registration is superfluous.

2

## The Parties

According to the testimony of Tim Davis, one of petitioner's senior project managers, petitioner is engaged in the manufacturing and rebuilding of piston aircraft engines through its Teledyne Continental Motors subsidiary. Petitioner's aircraft engines are sold under the mark CONTINENTAL; the engines include a data plate bearing the name "Continental Motors." Among petitioner's other products is an ignition harness that is, according to Mr. Davis, an essential part of an aircraft engine. In 1991, petitioner began using the mark GOLD SEAL in connection with its line of aircraft engine ignition harnesses. According to Mr. Davis, petitioner's ignition harness costs $300-$500. The ignition harnesses are sold part and parcel of an aircraft engine, and also as a separate part; the harnesses are sold to original equipment manufacturers and to distributors who then sell to aircraft owners and operators. Petitioner promotes its harnesses in sales brochures and at trade shows.

Respondent, as shown by the testimony of Allen Head, applicant's president, and David Leis, applicant's vice president, sales and marketing, is engaged in the rebuilding and overhauling of piston aircraft engines. Respondent took its name from a defunct entity, Western

Skyways, that operated out of Troutdale, Oregon. This entity rebuilt and sold aircraft engines under the mark GOLD SEAL from the mid-1950s until the company dissolved in 1986. Respondent was formed, in 1994, mainly by managers and former employees of the dissolved company. Mr. Head explained the adoption of respondent's mark:

> The--the Gold Seal has been an icon in the industry for years, dating back to Troutdale, and....it specifies that it's to some rigid standard and the serviceability of it has certain expectations and as well as reliability.
>
> When we were sitting around the table, deciding what to call this company, I had three gentlemen sitting around the table with me that worked at Troutdale at Western Skyways, and they had a lot of pride in that company, pride as much as they were let down by the fact that the corporate headquarters closed them down, and so, recognizing this pride, we decided to call this company Western Skyways. And I checked with the Secretary of State, the corporate name was available, and I checked with the Trademark Office, and the trademark had been abandoned, so we decided to call the company Western Skyways and the Gold Seal Engine. (Head dep., pp. 15-16).

Respondent began its use of the mark GOLD SEAL in connection with rebuilt and overhauled aircraft engines in 1994. Mr. Head indicated that other manufacturers make all of the replacement parts used in respondent's rebuilt and

4

overhauled engines. Engines originally manufactured by petitioner are among the engines rebuilt by respondent and then branded with respondent's GOLD SEAL mark. According to Mr. Head, respondent also is an authorized distributor to sell petitioner's products, and respondent has used petitioner's parts in respondent's GOLD SEAL rebuilt engines. In this connection, respondent carries petitioner's GOLD SEAL ignition harnesses in its parts inventory. Respondent is also able to service petitioner's engines. Respondent's rebuilt engines cost $20,000-$40,000, and are sold to aircraft owners, aircraft fleet operators and charter operators. Respondent's engines are advertised in trade publications (the same ones used by petitioner to promote its products), and at trade shows. Respondent's annual advertising budget is approximately $40,000. Respondent also owns incontestable registrations of the mark for GOLD SEAL for aircraft logbooks and aircraft engine overhaul and reconditioning services.

### Evidentiary Issue

Respondent has objected to the inclusion of petitioner's pleaded Registration No. 1943566 in the record, contending that petitioner's registration was not properly made of record. Although petitioner had an

5

opportunity to respond in its reply brief, no mention was made of respondent's objection.

Attached to the petition for cancellation is a photocopy of petitioner's pleaded Registration No. 1943566, identified as "Exhibit B." In paragraph 3 of the petition, petitioner alleged that it is the owner of this registration, and that a copy was attached to the petition. Respondent, in paragraph 3 of the answer, admitted only that Exhibit B is a copy of the referenced registration; respondent indicated that it "denies the remaining allegations of paragraph 3 of the petition."

With one exception, exhibits attached to a pleading are not evidence on behalf of the party to whose pleading they are attached unless they are thereafter, during the time for taking testimony, properly identified and introduced in evidence as exhibits. Trademark Rule 2.122(c). The one exception to this rule is a current status and title copy, prepared by the Office, of a plaintiff's pleaded registration. Trademark Rule 2.122(d). Inasmuch as the copy attached to the petition is not a status and title copy prepared by the Office, the submission does not conform to Rule 2.122(d). Further, respondent, in its answer, did not admit either that petitioner was the owner of the registration or that the

6

registration was valid and subsisting; respondent merely admitted that Exhibit B was a copy of a registration setting forth certain information.

The pleaded registration likewise was not properly introduced at trial. Firstly, the registration was not included in petitioner's notice of reliance. Trademark Rule 2.122(d)(1). Secondly, Mr. Davis' testimony is devoid of any testimony relating to the status and title of petitioner's registration. Respondent, during the cross-examination of Mr. Davis, identified and introduced, as Exhibit 32, a photocopy of the file history of Registration No. 1943566. Although respondent asked various questions regarding information in the file history, nothing was asked about current status and title of the pleaded registration. (Davis dep., pp. 72-77).

Finally, although petitioner also points to its reliance on respondent's response to interrogatory no. 13 as making the pleaded registration of record, that is certainly not the case. Respondent's answer to the interrogatory relates to its first knowledge of petitioner (in respondent's underlying application when petitioner's pleaded registration was cited as a Section 2(d) bar), and in no way bears on the current status and title of the pleaded registration.

7

In view of the above, we agree with respondent that petitioner failed to properly make its pleaded registration of record. In the absence of evidence of the current status and title of Registration No. 1943566, the registration will not be considered. Thus, for purposes of the likelihood of confusion analysis, petitioner must rely on its common law rights as shown by the record.

## Priority

Notwithstanding the absence of petitioner's pleaded registration from the record, Mr. Davis's testimony establishes petitioner's use of the mark GOLD SEAL in connection with ignition harnesses for piston aircraft engines. According to Mr. Davis, petitioner began using its mark GOLD SEAL in connection with ignition harnesses in 1991, a fact acknowledged by respondent. Respondent, on the other hand, did not commence use of its mark in connection with aircraft engines until 1994. Respondent has not claimed and, in view of the facts, cannot claim any prior rights accruing from the use of the abandoned GOLD SEAL mark by the earlier Western Skyways operating out of Oregon.

As shown by the record, petitioner has priority of use of the mark GOLD SEAL as established by its prior use of

the mark on ignition harnesses for piston aircraft engines, and respondent does not contend otherwise.

## Likelihood of Confusion

Our determination under Section 2(d) is based on an analysis of all of the facts in evidence that are relevant to the factors bearing on the likelihood of confusion issue.  In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).  Petitioner must establish that there is a likelihood of confusion by a preponderance of the evidence.  The relevant du Pont factors in the proceeding now before us are discussed below.

## The Marks

There is no issue with respect to the similarity between the parties' marks; the marks are identical, both are GOLD SEAL.  Respondent's mark is registered in standard character form, and petitioner's common law mark, as actually used, is displayed in a similar block form.

This factor heavily favors petitioner.

## Third-Party Use

The sixth du Pont factor requires consideration of any evidence pertaining to "the number and nature of similar marks in use on similar goods."  In an attempt to show that petitioner's mark is less distinctive and is entitled to a narrow scope of protection, respondent relied upon three

9

third-party registrations of GOLD SEAL marks.[5] These GOLD SEAL registrations cover tires, hose clamps and spring brake actuators for air braked vehicles.

This evidence is entitled to little probative value in determining likelihood of confusion. Olde Tyme Foods Inc. v. Roundy's Inc., 961 F.2d 200, 22 USPQ2d 1542 (Fed. Cir. 1992); and Carl Karcher Enterprises, Inc. v. Stars Restaurants Corp., 35 USPQ2d 1125 (TTAB 1995). The registrations are not evidence that the marks are in use, much less that purchasers are familiar with them. Further, contrary to the gist of respondent's remarks, the probative value of this evidence is greatly diminished by the fact that the goods covered in the third-party registrations are not specifically identified for use for aircraft (as are the goods herein), and are, in any event, distinctly different from aircraft engines and ignition harnesses for aircraft engines.

This factor is neutral or weighs slightly in petitioner's favor.

---

[5] In addition to the third-party registrations, respondent also pointed to its ownership of two other registrations of the mark GOLD SEAL covering "aircraft log books" and "aircraft engine overhaul and reconditioning services." (See discussion of Morehouse defense, infra).

## The Goods

With respect to the goods, it is well established that the goods of the parties need not be similar or competitive, or even that they are offered through the same channels of trade, to support a holding of likelihood of confusion. It is sufficient that the respective goods of the parties are related in some manner, and/or that the conditions and activities surrounding the marketing of the goods are such that they would or could be encountered by the same persons under circumstances that could, because of the similarity of the marks, give rise to the mistaken belief that they originate from the same source. See Hilson Research, Inc. v. Society for Human Resource Management, 27 USPQ2d 1423 (TTAB 1993); and In re International Telephone & Telephone Corp., 197 USPQ 910, 911 (TTAB 1978). The issue, of course, is not whether purchasers would confuse the goods, but rather whether there is a likelihood of confusion as to the source of the goods. In re Rexel Inc., 223 USPQ 830 (TTAB 1984).

In comparing the goods, we initially note that where identical marks are involved, as is the case here, the degree of similarity between the parties' goods that is required to support a finding of likelihood of confusion declines. In re Shell Oil Co., 992 F.2d 1204, 26 USPQ2d

11

1687, 1688-1689 (Fed. Cir. 1993); Time Warner Entertainment Co. v. Jones, 65 USPQ2d 1650, 1661 (TTAB 2002); and In re Opus One Inc., 60 USPQ2d 1812 (TTAB 2001).

As described by Mr. Davis, an ignition harness "transmits electrical energy from the magneto, which is a special electrical generator, and carries the electrical energy to the sparkplugs for the ignition event as the engine runs." (Davis dep., p. 9). Mr. Davis testified that petitioner's ignition harnesses may be sold both as a part of the engine or separate from the engine. Id. It is possible, according to Mr. Head, respondent's president, that respondent's rebuilt or overhauled engines may include petitioner's ignition harnesses as a component part thereof. (Head dep., p. 44). Mr. Head testified that "[w]e have an ignition harness in our Parts department that is from [petitioner]" that carries the GOLD SEAL mark. Mr. Head responded affirmatively to the following question: "So it's a possibility, then, that an engine manufactured-- remanufactured by you, by Western Skyways, would have on it, in addition to 'Western Skyways Gold Seal' mark, label, it could also have a Continental or Teledyne Continental mark as well as Gold Seal on the ignition harness; is that a possibility?" (Head dep., p. 45). Thus, it is possible

12

for petitioner's GOLD SEAL ignition harness to be part of respondent's GOLD SEAL rebuilt/overhauled aircraft engine.

Lest there be any doubt on this du Pont factor, Mr. Head testified that "[a]n ignition harness is a part of an engine, it's an important part of the engine as the carburetor or the cylinders." (Head dep., p. 15).

Although the goods are distinctly different, we find that petitioner's ignition harnesses for piston aircraft engines and respondent's aircraft engines are commercially related. Again, the test is not whether purchasers would confuse an ignition harness, a part for an aircraft engine, with the engine itself, but rather whether purchasers would be confused as to the source of these goods. See In re Jeep Corp., 222 USPQ 333 (TTAB 1984).

This factor favors petitioner.

### Trade Channels

Aircraft engines and ignition harnesses for aircraft engines, as shown by the record, travel in the same or similar channels of trade. (Davis dep., p. 10). As indicated earlier, respondent carries petitioner's harnesses in its parts inventory, and it is possible for petitioner's harness to be used in one of respondent's rebuilt or overhauled engines. In addition, as indicated

13

earlier, the parties advertise in the same trade publications.

The similar trade channels favor petitioner.

### Conditions of Sale and Classes of Purchasers

Petitioner's evidence shows that its ignition harnesses are sold to distributors who in turn sell to the end users, namely, owners and operators of aircraft. Petitioner also sells to original equipment manufacturers (Davis dep., p. 9) and to engine overhaul shops. (Davis dep., p. 58). Among petitioner's other customers are "fixed base operators" that Mr. Davis analogizes to an "old-fashioned service station." According to Mr. Davis, these entities exist at airports and they perform maintenance on aircraft.

Respondent's aircraft engines are sold to aircraft owners, including private individuals, fleet operators, flight schools, air ambulance operators and charter operators.

In view of the above, we find that there is an overlap in the classes of purchasers for the goods. Although this factor weighs in petitioner's favor, the weight is significantly reduced by the conditions of sale and sophistication of the purchasers, factors weighing in favor of respondent.

14

The inherent nature of aircraft engines dictates that purchasers will be sophisticated.  As shown by Mr. Leis' testimony, respondent's engines range in price between $14,000 and $40,000, with an average price of about $20,000.  Whether an aircraft owner, operator, or engine overhaul shop, these sophisticated purchasers may be expected to exercise a high degree of care in purchasing an aircraft engine or an ignition harness therefor. Electronic Design & Sales, Inc. v. Electronic Data Systems Corp., 954 F.2d 713, 21 USPQ2d 1388 (Fed. Cir. 1992).  As petitioner itself acknowledged in a response to an Office action in the underlying application for its pleaded registration:  "purchasers of ignition harnesses are considered highly sophisticated where any goods used on airplanes must be approved by the FAA," and "any inference that [petitioner's] ignition harnesses may appropriately be purchased and installed by other then [sic] sophisticated purchasers is unwarranted."  (Davis dep., ex. no. 32). Further, Mr. Davis, in one instance, recognized that customers for the parties' goods are often "pretty knowledgeable" about the sources of the products they are buying.  (Davis dep., p. 66).  In another instance, Mr. Davis referred to petitioner's customers as "highly sophisticated."  (Davis dep., pp. 76-77).

15

The high cost of respondent's aircraft engines, coupled with the sophistication required in purchasing these engines and parts therefor such as ignition harnesses, weighs in favor of respondent.

### Actual Confusion

At the time of trial in this case, the parties' marks had been in contemporaneous use for approximately ten years. Neither of the parties is aware of any instances of actual confusion.

Petitioner dismisses the absence of actual confusion, contending that the factor "is not relevant given that [respondent] had (at best) serviced a mere 3900 engines (40 engines/month x 12 months x 8 years rounded up) by the time [petitioner] filed its petition to cancel in this case." (Brief, p. 10).

Respondent points, on the other hand, to the lack of actual confusion as persuasive evidence that there is no likelihood of confusion.

As indicated above, the record establishes contemporaneous use of the parties' respective marks without any known instances of actual confusion for a period of at least ten years. Mr. Davis testified that petitioner is unaware of any misdirected phone calls,

16

invoices, billings or requests for service during that time.

Although the record does not include any specifics about the extent of use (sales, advertising expenditures, etc.) of petitioner's mark, we do not share petitioner's dismissive view of respondent's use. We know the extent of respondent's use, and that use is not, in our view, insignificant. There have been over ten years of overlapping use in the same trade channels and among the same or similar classes of purchasers without any known instances of actual confusion.

Given that the goods travel in the same trade channels to the same classes of purchasers, we find that the absence of known actual confusion is a factor weighing in respondent's favor. See Olde Tyme Foods, Inc. v. Roundy's, Inc., supra at 1546 [the length of time and conditions under which there has been concurrent use without evidence of actual confusion is relevant evidence of the lack of a likelihood of confusion]. So as to be clear, however, we recognize that actual confusion is not necessary to show a likelihood of confusion. See, e.g., Hewlett-Packard Co. v. Packard Press, Inc., 281 F.3d 1261, 62 USPQ2d 1001 (Fed. Cir. 2002).

17

## Conclusion:  Likelihood of Confusion

We have carefully considered all of the evidence pertaining to the relevant du Pont factors, as well as all of the parties' arguments with respect thereto (including any evidence and arguments not specifically discussed in this opinion), and we conclude that petitioner has proved, by a preponderance of the evidence, its Section 2(d) claim of likelihood of confusion.  The marks are identical, and this factor weighs heavily in petitioner's favor.  The goods of the parties are closely related, and the channels of trade and purchasers overlap.  These du Pont factors outweigh, in our likelihood of confusion analysis, the other factors of purchasers' sophistication and absence of actual confusion.

Any doubt on the issue of likelihood of confusion is resolved in favor of the prior user and against the newcomer.  Gillette Canada Inc. v. Ranir Corp., 23 USPQ2d 1768 (TTAB 1992).

## Morehouse Defense

Respondent has asserted a "Morehouse" defense based on its ownership of two previously issued registrations. Respondent essentially contends that petitioner cannot be damaged by the existence of its registration of the mark GOLD SEAL sought to be cancelled herein in light of its

18

other two, unchallenged, registrations of the same mark
that will continue to exist.  Morehouse Manufacturing
Corporation v. Strickland & Co., supra.

Respondent's two prior registrations that form the
bases of this defense are of the mark GOLD SEAL for
"aircraft log books"[6] and "repair and maintenance services,
namely, aircraft engine overhaul and reconditioning
services."[7]

The defense is proper where the existing registration
or registrations relied upon are for the same or
substantially identical mark and the same or substantially
identical goods and/or services as the challenged
registration.  O-M Bread, Inc. v. United States Olympic
Committee, 65 F.3d 933, 36 USPQ2d 1041 (Fed. Cir. 1995);
Jackes-Evans Manufacturing Co. v. Jaybee Manufacturing
Corp., 481 F.2d 1342, 179 USPQ 81 (CCPA 1973); Key
Chemicals, Inc. v. Kelite Chemicals Corp., 465 F.2d 1040,
175 USPQ 99 (CCPA 1972); La Fara Importing Co. v. F. Lil de
Cesso di Filippo Fara S. Martino S.p.A., 8 USPQ2d 1143
(TTAB 1988); Mason Engineering and Design Corp. v. Mateson
Chemical Corp., 225 USPQ 956 (TTAB 1985); and Liberty &

---

[6] Registration No. 1925425, issued October 10, 1995; renewed.
[7] Registration No. 2275239, issued September 7, 1999; combined Sections 8
and 15 affidavit accepted and acknowledged.

Co., Ltd. v. Liberty Trouser Co. Inc., 216 USPQ 65 (TTAB 1982).

In the present case, respondent's mark is identical to the mark shown in its two previously issued registrations. Further, it is clear that "aircraft log books" and "repair and maintenance services, namely, aircraft engine overhaul and reconditioning services" covered by respondent's prior registrations are related to the goods, that is, "aircraft engines," listed in the registration petitioner seeks to cancel. Nevertheless, the goods in the involved registration clearly are different from the goods and services listed in the prior registrations. Thus, respondent's ownership of the two prior registrations cannot serve to preclude petitioner from contesting respondent's right to maintain the registration petitioner seeks to cancel. TBC Corporation v. Grand Prix Ltd., 12 USPQ2d 1311 (TTAB 1989).

Accordingly, this defense fails.

## Laches

Respondent argues that the petition for cancellation should be denied because of laches due to petitioner's unreasonable delay in asserting its rights until October 2002, despite knowledge of respondent's mark when it was published for opposition in December 1998.

20

A petitioner must be shown to have had actual knowledge or constructive notice of a registrant's trademark use to establish a date of notice from which a delay of laches can be measured. Loma Linda Food Co. v. Thomson & Taylor Spice Co., 279 F.2d 522, 126 USPQ 261 (CCPA 1960). "[L]aches, with respect to protesting the issuance of the registration for the mark, could not possibly start to run prior to when...[the] application for registration was published for opposition." National Cable Television Association, Inc. v. American Cinema Editors, Inc., 937 F.2d 1572, 19 USPQ2d 1424, 1432 (Fed. Cir. 1991). National Cable involved a petitioner that had actual knowledge of the respondent's use prior to the date of publication of the respondent's underlying application for registration. In the present case, there is no evidence that petitioner had actual knowledge of respondent's use of its mark for aircraft engines until after the date respondent's mark was published for opposition on December 8, 1998.[8] The Federal Circuit, in Bridgestone/Firestone

---

[8] When respondent's underlying application for its GOLD SEAL *service mark* registration was published for opposition in the Official Gazette, petitioner filed two extensions of time to oppose the service mark registration; however, the requests were denied as untimely and the application matured into a registration. Petitioner did not subsequently petition to cancel that registration. Mr. Davis testified that he was not aware of the reasons why petitioner did not proceed with a notice of opposition against registration of GOLD SEAL as a service mark. The service mark application was filed three days after the filing date of the involved underlying application to register GOLD

Research Inc. v. Automobile Club de l'Ouest de la France,

245 F.3d 1359, 58 USPQ2d 1460, 1462-63 (Fed. Cir. 2001)

stated the following:

> The Trademark Act establishes various
> events in the life of a registered
> trademark which impact upon an adverse
> claimant, from which events action
> could be taken and thus from which the
> period of delay may be measured.  Thus
> 15 U.S.C. § 1072 provides that
> registration on the principal register
> is constructive notice of the
> registrant's claim of ownership of the
> trademark; § 1065 states the conditions
> of incontestability of the registrant's
> right to use the trademark; and § 1115
> provides that registration is evidence
> of the registrant's exclusive right to
> use the trademark.

See Willson v. Graphol Products Co., 188 F.2d 498, 89 USPQ

382 (CCPA 1951) ["We are of the opinion that registrations

under the 1905 Act are public records and that as such they

constitute such constructive notice as will preclude a

cancellation petitioner from pleading ignorance of the

existence of a particular mark."].  Respondent's Principal

Register registration issued on March 2, 1999; therefore,

petitioner was put on constructive notice of respondent's

claim of ownership on the date of issuance of the involved

---

SEAL as a trademark for aircraft engines.  Petitioner did not file any extension to oppose the underlying application that matured into the registration involved herein.  It would appear that petitioner's actual knowledge of respondent's business activities under the mark GOLD SEAL occurred after the registration of the mark in issue.

registration, namely, March 2, 1999.[9]  The petition for cancellation was filed on October 18, 2002.  Thus, the length of petitioner's delay in filing the petition for cancellation is approximately three years and eight months.[10]

"To prevail on its affirmative defense [of laches, respondent] was required to establish that there was undue or unreasonable delay by [petitioner] in asserting its

---

[9] Contrary to respondent's assertion that petitioner had constructive notice of respondent's "registration" when its underlying application was published for opposition, publication of a mark in the Official Gazette does not provide constructive notice.

[10] In reviewing the Board's case law in the wake of National Cable, we recognize that there have been some discrepancies regarding the point in time when the laches clock for cancellations begins to run.  See, e.g., Turner v. Hops Grill & Bar Inc., 52 USPQ2d 1310, 1312 (TTAB 1999) ["In an opposition or cancellation proceeding, where the objection is to the issuance of a registration of a mark, laches starts to run when the mark in question is published for opposition....In this case, there is no genuine issue of material fact that laches started to run in 1992, when the registration issued to respondent's predecessor-in-interest."]; and Aquion Partners L.P. v. Envirogard Products Ltd., 43 USPQ2d 1371, 1373 n. 7 (TTAB 1997) ["The trademark statute, unlike the patent law, specifically provides that registration of a mark on the principal register shall be constructive notice of the registrant's claim of ownership thereof....the U.S. Court of Appeals for the Federal Circuit has held that in trademark opposition and cancellation proceedings, laches begins to run when the mark in question is published for registration."].  Our decision herein is intended to clarify this point.  That is, in the absence of actual knowledge prior to the close of the opposition period, the date of registration is the operative date for calculating laches.  Bridgestone/Firestone Inc. v. Automobile Club de l'Ouest de la France, supra at 1463, citing National Cable (laches runs from the time from which action could be taken against the trademark rights inhering upon registration).  See generally J.T. McCarthy, McCarthy on Trademarks and Unfair Competition, §§ 20:75 and 31:40 (4th ed. 2005) ["Because of the constructive notice provisions of § 22 of the Lanham Act, it seems clear that the constructive notice that is triggered by registration should serve to put potential petitioners for cancellation on notice as a matter of law.  Because a petition to cancel cannot be filed until a registration exists, the laches clock for cancellations should not begin running until registration and, because of constructive notice, not begin to run at any point after registration."].

rights, and prejudice to [respondent] resulting from the delay." Id. at 1462.

As indicated above, petitioner waited over three and one-half years prior to bringing this petition for cancellation. Mr. Head testified that respondent heard "not a peep" from petitioner when the underlying application was published; and that petitioner's first contact with respondent regarding the involved registration was when the petition for cancellation was filed. (Head dep., p. 39).

Petitioner is conspicuously silent regarding its reasons for the delay. See J.T. McCarthy, McCarthy on Trademarks and Unfair Competition, supra at § 31:14 ["The trademark owner is usually expected to give some reason for delay which appears to cause prejudice. It is dangerous to simply stand mute and take the position that there is no obligation to explain apparent lethargy."]. Rather than squarely addressing the laches defense in either its main brief or reply brief, petitioner merely takes the tack that laches does not apply due to the inevitability of confusion. Petitioner's complete silence on the reason for its delay in taking action is very problematic for its position. See Procter & Gamble Co. v. J.L. Prescott Co., 102 F.2d 773, 40 USPQ 434, 442 (3d Cir. 1939), *cert.*

*denied*, 308 U.S. 557 (1939) [that delay was unexplained "must weigh heavily in the balance against it"].

We find that petitioner's delay of over three and one-half years, and the complete absence of any reasonable excuse for its inaction, constitutes undue delay prior to filing the petition for cancellation. J.T. McCarthy, McCarthy on Trademarks and Unfair Competition, supra at § 20:76 ["The point is that laches is not an absolute time limit like a statute of limitations. It is an equitable defense measured by delay weighed against the resulting prejudice to registrant."].

"Mere delay in asserting a trademark-related right does not necessarily result in changed conditions sufficient to support the defense of laches. There must also have been some detriment due to the delay." Bridgestone/Firestone Research Inc. v. Automobile Club de l'Ouest de la France, supra at 1463. In the present case, respondent has asserted economic prejudice based on its development of a valuable business and good will around its GOLD SEAL mark during the time petitioner raised no objection.

When there has been an unreasonable period of delay by a plaintiff, economic prejudice to the defendant may ensue whether or not the plaintiff overtly lulled the defendant

25

into believing that the plaintiff would not act, or whether or not the defendant believed that the plaintiff would have grounds for action. Id. citing A.C. Aukerman Co. v. R.L. Chaides Construction Co., 960 F.2d 1020, 22 USPQ2d 1321, 1336 (Fed. Cir. 1992)(*en banc*) ["reliance is not a requirement of laches"]. Economic prejudice arises from investment in and development of the trademark, and the continued commercial use and economic promotion of a mark over a prolonged period adds weight to the evidence of prejudice. Id.

Accordingly, the essential inquiry herein is to determine if there was a change in the economic position of respondent during the period of petitioner's delay. State Contracting & Engineering Corp. v. Condotte America, Inc., 346 F.3d 1057, 68 USPQ2d 1481 (Fed. Cir. 2003). The record includes evidence showing that respondent invested in and promoted its GOLD SEAL aircraft engines during the period during which petitioner was silent. According to Messrs. Head and Leis, respondent's aircraft engines cost in the range of $14,000-$40,000, with an average price of around $20,000. (Head dep., p. 20; Leis dep., p. 15). Respondent rebuilds and/or overhauls 30-40 engines per month. (Head dep., p. 13; Leis dep., p. 8). In addition, Mr. Leis testified that respondent's annual advertising budget is

26

$40,000; respondent's answer to Interrogatory No. 7 indicated an annual budget of "approximately $45,000." The mark has been promoted in print advertising, at trade shows (3-4 per year), and through direct mailings, telephone solicitations and sales visits.

Although respondent did not provide precise sales and advertising figures for the period constituting petitioner's delay,[11] it is clear that, during petitioner's period of silence, respondent invested in and promoted its GOLD SEAL brand. Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes, Inc., 971 F.2d 732, 23 USPQ2d 1701, 1704 (Fed. Cir. 1992) ["Opposer's right to prevail in this proceeding arises from the particular provisions of the Lanham Act that are designed to encourage registration of marks. Opposer took advantage of those provisions. Applicant did not. Applicant, as the prior user, could and should have taken steps to prevent registration by Opposer of the mark LINCOLN. It had an opportunity to oppose or petition to cancel Opposer's registration during a period of more than five years and failed to avail itself of that opportunity."]. Economic damage may be a direct function

---

[11] Respondent, in response to Interrogatory No. 8, indicated that it would furnish "annual gross dollar sales" to petitioner under a protective agreement. The record does not reveal the existence of any protective agreement, and the specific figures were never disclosed during discovery or testimony.

of the delay involved. The record demonstrates economic prejudice to respondent if its registration were to be cancelled at this point in time. Ralston Purina Co. v. Midwest Cordage Co., 373 F.2d 1015, 153 USPQ 73, 76 (CCPA 1967) ["It is probably true that long acquiescence in the use of a trademark by a successful business, even without an expansion of trade, may provide a basis for a valid inference of prejudice....Logically, we suppose, it must be admitted that each day sees some incremental aggrandizement of goodwill--each advertising dollar expended adds in some sense to registrant's equity."].

Accordingly, respondent has established a laches defense against petitioner's likelihood of confusion claim.

## Whether confusion is inevitable

The final point to consider is whether the confusion between the parties' marks is inevitable because, if it is, then the defense of laches is not applicable. Ultra-White Co., Inc. v. Johnson Chemical Industries, Inc., 465 F.2d 891, 175 USPQ 166 (CCPA 1972); and Reflange Inc. v. R-Con International, 17 USPQ2d 1125, 1131 (TTAB 1990) ["It is not necessary to discuss this theory because it is well established that equitable defenses such as laches and estoppel will not be considered and applied where, as here, the marks of the parties are identical and the goods are

28

the same or essentially the same."].  This is so because any injury to respondent caused by petitioner's delay is outweighed by the public's interest in preventing confusion in the marketplace.  Turner v. Hops Grill & Bar, Inc., 52 USPQ2d 1310, 1313 (TTAB 1999), citing Coach House Restaurant Inc. v. Coach and Six Restaurants, Inc., 934 F.2d 1551, 19 USPQ2d 1401, 1409 (11th Cir. 1991).

Although there is a likelihood of confusion between petitioner's mark GOLD SEAL for ignition harnesses for aircraft engines and respondent's mark GOLD SEAL for aircraft engines, we find that the evidence of record does not establish inevitable confusion.

In the present case, the marks are identical.  The goods, however, are not "the same or substantially the same."  Although we have found the goods to be commercially related, they are hardly identical.  Thus, we do not view confusion between the parties' marks as inevitable.

In addition, there are other du Pont factors that militate against a finding that confusion is inevitable between the parties' marks.  More specifically, the sophistication of purchasers and the absence of actual confusion are factors weighing against a finding that confusion is inevitable.

29

As discussed above, the purchasers of the parties' goods comprise a sophisticated class of consumers. These customers include aircraft owners and operators who would be knowledgeable about what they are buying.

The sophistication of purchasers may well be the underlying reason for the lack of any actual confusion known to the parties. And, while petitioner has established by a preponderance of the evidence that confusion is likely, the absence of actual confusion over a period of ten years supports our conclusion that confusion is not inevitable. Stated differently, if confusion were inevitable, there were many opportunities for there to be known instances of actual confusion during the ten years of contemporaneous use of the marks. After all, the goods, bearing the identical mark, travel in the same trade channels to the same purchasers. Respondent even carries petitioner's GOLD SEAL ignition harnesses in its parts inventory. The witnesses for both parties testified, however, that the parties are unaware of any instances of actual confusion. In particular, Mr. Davis, petitioner's witness, stated that petitioner could not show actual confusion. (Davis dep., p. 57).

In view of our finding that confusion is not inevitable, respondent's valid laches defense is applicable

30

and, thus, petitioner's likelihood of confusion claim must be dismissed.

**Decision:**  The petition for cancellation is denied.